ADOPTION OF YVETTE (No. 1)
(and three companion cases[1]).

No. 07-P-87.

Suffolk. October 9, 2007. - March 6, 2008.

Present: CYPHER, DREBEN, & COHEN, JJ.

*Massachusetts Child Custody Jurisdiction Act. Parental Kidnapping Prevention Act. Jurisdiction,* Custody of child. *Parent and Child,* Custody. *Practice, Civil,* Assistance of counsel.

In a custody dispute involving the parents of two children, the paternal grandmother (who had been awarded custody of the children by another State), and the children's great-aunt in Massachusetts (with whom the grandmother had left the children and who later refused to relinquish the children to the grandmother), the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738, required the Juvenile Court judge to refrain from exercising jurisdiction under the Massachusetts Child Custody Jurisdiction Act, G. L. c. 209B, §§ 1-14, to issue decrees finding the children in need of care and protection and dispensing with the need for parental consent to their adoption, where the State that had previously determined the children's custody did so in an ongoing child welfare case, retained home State jurisdiction, and had not declined to modify the relevant custody order [335-338]; moreover, although PKPA did contain jurisdictional exceptions for cases of abandonment or emergency [338-340], it was questionable whether the requirements of the abandonment exception had been met [340-341], and the judge exceeded the permissible exercise of emergency jurisdiction [341-343]; nevertheless, where a court in the home State ordered its jurisdiction terminated in favor of Massachusetts nine months after the Juvenile Court became involved, and where the arguments against the curative effect of that order were unavailing, due to lack of standing [343], waiver of objection to the order [343-345], or, as to the mother, failure to show that any error by her counsel in not pressing the jurisdictional issue affected the outcome of the case [345-346], there was no need to vacate the Juvenile Court's decrees of termination on jurisdictional grounds [346-347].

PETITIONS filed in the Suffolk County Division of the Juvenile Court Department on July 31, 2003.

The cases were heard by *Terry M. Craven,* J.

[1]Adoption of Frank; Guardianship of Yvette; and Guardianship of Frank. The children's names are pseudonyms.

*Deborah Sirotkin Butler* (*Michael L. Rich* with her) for the great-aunt.

*Deborah W. Kirchwey* for the grandmother.

*Daniel R. Katz* for the father.

*Matthew H. Beaulieu* for the mother.

*Brian Pariser* for Department of Social Services.

*Azizah P. Yasin* for the children.

COHEN, J. A judge of the Suffolk County Division of the Juvenile Court Department adjudicated Yvette and Frank to be in need of care and protection, committed them to the custody of the Department of Social Services (department), and dispensed with the need for their parents' consent to adoption. In so doing, the judge also determined that the children should not be placed in the care of either their paternal grandmother (grandmother) or their paternal great-aunt (aunt), whose dispute over the custody of the children precipitated the department's involvement.[2]

The mother, the father, the grandmother, and the aunt appeal from the decrees and from other orders of the Juvenile Court.[3,4] In addition to raising various individualized issues, each of these appellants claims that the decrees must be vacated because, under the Massachusetts Child Custody Jurisdiction Act (MCCJA), G. L. c. 209B, §§ 1-14, and the Federal Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738, the Massachusetts courts should not have exercised jurisdiction over this matter where, at the inception of the case, the children's custody was the subject of outstanding orders in an ongoing child welfare case in the Circuit Court for Baltimore City, Maryland (Baltimore City Court).[5]

---

[2] As a result of an interdepartmental assignment, the termination case was heard together, but not consolidated with, a guardianship case filed by the aunt in the Suffolk Division of the Probate and Family Court. The record before us contains the judge's findings in both the termination case and the guardianship case. We address the guardianship case in the memorandum and order issued this date. See note 5, *infra.*

[3] These orders are the denial of the appellants' joint motion to vacate the decrees for lack of subject matter jurisdiction; the denial of the parents' joint motion to vacate the decrees or grant a new trial on the ground of ineffective assistance of trial counsel; and rulings denying the aunt full party status in the termination case.

[4] The appellees are the department and the children.

[5] The appellants' numerous other arguments have been considered and rejected

We agree that the Juvenile Court exceeded the limited, temporary jurisdiction that was within its authority to exercise. Nevertheless, because the Maryland court terminated its own jurisdiction in favor of Massachusetts nine months after the Juvenile Court became involved, and no party objected to the case going forward in Massachusetts, it is not necessary to vacate the decrees.

1. *Background.*[6] In the summer of 2002, two year old Yvette and her infant brother Frank resided with their unmarried mother and father in Caroline County, Maryland. On July 16, 2002, allegations of parental neglect resulted in the initiation of child in need of assistance (CINA) proceedings in the Circuit Court for Caroline County (Caroline County Court) and the children's placement in emergency care. On August 27, 2002, the Caroline County Court judge found the children's parents "unable to give the [children] proper care and attention without the assistance of this Court." The Caroline County Court judge committed the children to the legal and physical custody of the grandmother, subject to the protective supervision of the Caroline County Department of Social Services (Caroline County DSS), and entered an order requiring that the grandmother facilitate parental visitation, that Caroline County DSS make services available to the parents "toward reunification," and that the case undergo court review within six months. The Caroline County Court judge also expressly ordered that "this matter remain subject to the continuing jurisdiction of this Court."

The CINA case came up for review on December 6, 2002, at which time the Caroline County Court judge ordered that the children "continue to be in the care and custody of [the grandmother]," but changed supervision to the Baltimore City Department of Social Services (Baltimore City DSS), apparently because the grandmother resided in Baltimore. The Caroline County Court judge also ordered that the long-range permanency plan continue to be reunification, that the grandmother continue to

in a memorandum and order pursuant to Appeals Court Rule 1:28, as amended, 46 Mass. App. Ct. 1001 (1998), also issued this day. *Adoption of Yvette (No. 2)*, *post* 1112 (2008). The issues addressed in the memorandum are separable from those addressed in this opinion and involve additional facts not relevant here.

[6] We derive the facts from findings made by the judge after trial and in connection with the denial of the parties' motions to vacate, as well as from court records and other uncontroverted material in the record before us.

facilitate supervised visitation of the children with the parents, that the parents comply with service requirements and keep Caroline County DSS and the Caroline County Court advised of any changes of address, and that the case be transferred to the Baltimore City Court.

There things stood until the spring of 2003, when the children came to be present in Massachusetts. On April 9, 2003, the grandmother brought Yvette, then thirty-three months old, and Frank, then eighteen months old, to Boston, where the aunt resided. The grandmother soon returned to Maryland, leaving the children with the aunt. Approximately two months later, the grandmother came back to Boston and attempted to retrieve the children. The aunt refused to relinquish them, and, on June 16, 2003, filed a petition in the Suffolk Division of the Probate and Family Court seeking to be appointed the children's guardian. In her petition, the aunt alleged that when the grandmother brought the children to Boston, she stated that she no longer wished to care for them and that the aunt should become their guardian.

On July 25, 2003, the grandmother again traveled to Boston in an effort to retrieve the children. She filed a report with the Boston police, stating that she was the children's custodian, that she had brought them to Boston for a two-month visit with the aunt, and that the aunt now refused to return them. Three days later, on July 28, 2003, the grandmother filed a report with the department, pursuant to G. L. c. 119, § 51A, alleging that the children were suffering from neglect because of unsanitary conditions in the aunt's home and that Yvette, who had been observed with a black eye by another family member, had been physically abused while in the aunt's care.

Although the department screened the report as a "non-emergency," it promptly investigated the situation. A department worker visited the aunt's home the following day, July 29, 2003, and found unclean and overcrowded conditions due to the presence of numerous animals (ferrets, cats, birds, dogs, and a turtle), as well as inappropriate sleeping arrangements for the children. The worker also learned that the aunt had not brought Frank to the doctor since his arrival in Boston, despite his having a history of medical needs, and that, in May, Yvette had received a black eye, which, according to the aunt, was admini-

stered by Frank when the children were fighting with each other. During the worker's visit, the aunt reported that she had witnessed the grandmother verbally and physically abusing Yvette. She also reiterated that the grandmother had left the children in Boston with no intention of resuming custody. The § 51A report was supported in part. See note 16, *infra*. G. L. c. 119, § 51B.

On July 31, 2003, the department filed a care and protection petition in the Suffolk County Division of the Juvenile Court Department. On that same day, the judge held an initial hearing to determine if the immediate removal of the children was warranted. G. L. c. 119, § 24. The aunt was present, as were attorneys representing the department, the children, and the children's mother, father, and grandmother. Although the transcript of the initial hearing reflects that the judge and the parties knew of Maryland's pending involvement with the children and their family, and that the judge had read the December 6, 2002, Caroline County Court order in the CINA case, there was no discussion of jurisdiction or the desirability of contacting the Caroline County or Baltimore City Courts. The judge proceeded to award custody to the department until such time as a temporary custody hearing could be held, which, by agreement of counsel, was not until August 12, 2003. When that date came, however, the hearing was continued until September 5, 2003, due to a variety of scheduling difficulties involving the parties, counsel, and the court. Meanwhile, the children remained in emergency foster care in Massachusetts.

At the September 5, 2003, temporary custody hearing, the judge heard considerable testimony from five different witnesses relating to the dispute between the aunt and the grandmother over the children and the condition and suitability of their respective homes. Only after these subjects were explored were there two brief references to the subject of jurisdiction. The grandmother's attorney pointed out that the grandmother had the benefit of a custody order from a similar court in a different State, and counsel for the father emphasized that "these children have not been out of [Maryland] for six months," apparently referring to the six-month residency requirement for "home state" jurisdiction in Massachusetts under the MCCJA.

In the end, however, the judge and the parties went forward on the assumption that the only issue to be decided was whether it

was safe to return the children to the custody of the grandmother. It was not suggested or considered that the interests of Maryland in its ongoing case could be effectuated in any other way — such as arranging for the children to be turned over to the Maryland child welfare authorities who, by order of the Caroline County Court, retained supervision over the children's custody. When, at the conclusion of the temporary hearing, the judge found that Yvette and Frank would be at risk of abuse and neglect if returned to the grandmother, the judge placed them in the custody of the department pending a full hearing on the merits in Massachusetts.

Thereafter the department established service plans for the mother, the father, the grandmother, and the aunt, the latter two being viewed as potential placements for the children. A status conference was held on November 3, 2003, at which the judge stated that she could not return custody to the grandmother now that there was an open case in Massachusetts, without a home study under the Interstate Compact on the Placement of Children, St. 1963, c. 452, § 1. The grandmother's attorney noted the difficulty that the grandmother was having making herself available to the department and spoke of her financial problems getting back and forth to Massachusetts for visitation. He also pointed out that there remained a question of jurisdiction, but the judge said that the issue had not been raised and would have to be asserted by way of motion. No such motion was filed on behalf of the grandmother or any other party.

The record establishes that Baltimore City DSS was made aware of the Massachusetts proceedings as early as August 4, 2003, when a department worker called her counterpart in Baltimore to tell him that the department had gone to court and had obtained temporary custody of the children. The Baltimore worker told the department worker that the CINA case remained open. However, it appears that the Baltimore City Court remained uninformed of events in Massachusetts until it held a routine review hearing in December, 2003. Present at this hearing were the grandmother (without counsel), counsel for the children, and counsel for Baltimore City DSS. The mother and father did not appear personally or by counsel, and, so far as the record reveals, were not provided with notice of the hearing.

Following the review hearing, a Baltimore City Court order

dated December 4, 2003, noted that the matter had been transferred from Caroline County and that "[s]ince the transfer, the grandmother placed the children in Massachusetts. Due to the circumstances there, the [children] are now . . . in the equivalent of shelter care." The order stated that no changes be made to the existing Maryland orders, and the matter was reset for review on March 3, 2004, to obtain information from the department in Massachusetts.

Back in Massachusetts, the Juvenile Court judge received an interdepartmental assignment to hear the pending guardianship petition that had been filed by the aunt in the Probate and Family Court. The judge ordered that the two cases be heard concurrently but not consolidated. She permitted the aunt's counsel full access to the proceedings and the evidence, but did not allow the aunt to become a party to the termination case. The department set in motion home studies of the mother, who had resided in Florida since March, 2003, and father, who had moved in with the grandmother in Baltimore.

On March 3, 2004, another review hearing was held in the Baltimore City Court that the grandmother attended but not the children's parents, who, again, may not have been notified. The case was set down for further hearing on May 6, 2004, to permit further investigation regarding the children's removal to Boston. When that date arrived, Baltimore City DSS filed a motion in the Baltimore City Court seeking an order rescinding all prior orders of that court and terminating that court's jurisdiction.[7] The certificate of service on this motion indicated that it was

---

[7]Baltimore City DSS stated the following grounds in support of its motion:

"Upon further investigation by [Baltimore City DSS] it has been verified that these children are under the jurisdiction of the Massachusetts Courts and have been placed into the custody of the Boston Department of Social Services for foster care placement.

"These children have not been in this jurisdiction since these cases were transferred to this Court by the [Caroline County Court], as the custodian the grandmother . . . . had placed them with a relative in Massachusetts from whose custody they were removed and placed into foster care.

"Counsel for the State of Massachusetts, Thomasina Johnson, has released the above information to [Baltimore City DSS] counsel pursuant to this Court's order. She has further indicated that there is no need

mailed and hand-delivered to counsel for the children, counsel for the grandmother, and the grandmother personally. There is no indication of service upon either of the parents or their counsel.

The motion was heard on the same day that it was submitted, May 6, 2004. Present at the motion hearing were counsel for Baltimore City DSS, counsel for the children, and counsel for the grandmother. Neither the parents nor counsel on their behalf were present; again, there is nothing in the record to suggest that they received notice of the hearing. Adopting the reasons stated in the motion, the Baltimore City Court rescinded the grant of custody and guardianship to the grandmother and terminated its jurisdiction.

In Massachusetts, all parties were made aware of the decision of the Baltimore City Court, and, without objection, the case went forward in the Juvenile Court. The department oversaw service plans and continued to seek and obtain home studies relative to the mother, the father, the grandmother, and the aunt. In January, 2005, the department changed its goal from reunification to adoption, and in February filed a notice of intent to seek termination of the mother's and father's parental rights. Thereafter, in October and November, 2005, the termination case was tried together with the aunt's guardianship case, over a period of eight days.

The judge issued decrees finding the children in need of care and protection and dispensing with the need for parental consent to their adoption. In findings and conclusions issued on July 28, 2006, the judge adjudicated the mother and father unfit and found that the grandmother, whose desire for custody was supported by the father, was not a suitable placement for the children. The judge also rejected the aunt as a placement but ordered limited postadoption contact between her and the children. In separate findings and conclusions issued on August 29, 2006, the judge denied the aunt's petition for guardianship.

At the conclusion of the trial, the children remained in foster care in Massachusetts, the department having yet to secure an adoption resource for them. Sometime before August, 2006, the department located a preadoptive home for the children in New

for this Court to have competing jurisdiction over these children at this time."

York State, which is where the children reportedly resided at the time this appeal was argued.

As the case entered its appellate phase, new counsel appeared for the appellants and the children. On March 15, 2007, represented by their new counsel, the mother, father, and the grandmother jointly moved to vacate the decrees on the ground of lack of subject matter jurisdiction.[8] The mother and father also filed a second joint motion to vacate the decrees and for a new trial, on the ground that their respective trial attorneys were ineffective in failing, among other things, to promptly and adequately challenge the jurisdiction of the Massachusetts courts.[9] The trial judge denied the motions, being of the opinion that, under both State and Federal law, Massachusetts could properly exercise jurisdiction,[10] and that the two-pronged standard applicable to claims of ineffective assistance of counsel was not met.

2. *Discussion.* We are called upon to consider whether, notwithstanding the competency of the Juvenile Court to decide a case of this nature, the court nevertheless was required to decline to exert judicial power over this matter. See *E.N.* v. *E.S.*, 67 Mass. App. Ct. 182, 191-192 & n.20 (2006). Because more than one State of the United States was involved, the issue is in-

---

[8]Although technically not a party to the care and protection cases, the aunt signified her assent to this motion.

[9]The parties cited Mass.R.Civ.P. 60(b)(4) and 60(b)(6), 365 Mass. 828-829 (1974), in support of their motions. Although the Massachusetts Rules of Civil Procedure do not apply to proceedings to dispense with consent to adoption, parties may seek to vacate a decree by analogy and under the "cogent standard" of Mass.R.Civ.P. 60(b). *Adoption of Reid*, 39 Mass. App. Ct. 338, 341 (1995), quoting from *Care & Protection of Zelda*, 26 Mass. App. Ct. 869, 871 (1989) (relief granted under rationale of Mass.R.Civ.P. 60[b][6]).

[10]The judge's rationale with respect to jurisdiction may be summarized as follows: the court properly asserted "emergency jurisdiction" at the hearing held on July 31, 2003, because the children had been abandoned by the grandmother and were before the court because of allegations of abuse and neglect; between July 31, 2003, through May 6, 2004, the Massachusetts court could continue to act because "Maryland was on notice that emergency custody orders were being issued out of Massachusetts, and at no point contested Massachusetts' jurisdiction"; and Massachusetts was free to proceed with the final adjudication of the case, because, as of May 4, 2006, "the Maryland court vacated [the grandmother's] legal custody over the children" and terminated its jurisdiction. As we discuss *infra*, based upon the jurisdictional facts in the record, we analyze the jurisdiction issue differently.

formed not only by State law, G. L. c. 209B, the Massachusetts Child Custody Jurisdiction Act (MCCJA),[11] but also by Federal law, the Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A (2000). In situations where the MCCJA permits the exercise of jurisdiction, but the PKPA does not, the PKPA is controlling. *Delk* v. *Gonzalez*, 421 Mass. 525, 531 (1995). Where Massachusetts is the second court to be asked to adjudicate a custody dispute, the jurisdictional demands of the PKPA must be satisfied. *Ibid.* See *Hillier* v. *Hillier*, 41 Mass. App. Ct. 486, 488 (1996); *Fortier* v. *Rogers*, 44 Mass. App. Ct. 732, 733 (1998); *Cricenti* v. *Weiland*, 44 Mass. App. Ct. 785, 791 (1998).

Like other orders pertaining to child custody, orders in care and protection and termination proceedings are subject to the PKPA. See *Care & Protection of Vivian*, 420 Mass. 879, 883-885 (1995). As in all interstate child custody cases, conscientious adherence to State and Federal limitations on the exercise of jurisdiction is required, because "[t]he notions of comity demanded by our Federal system require us to concede that the courts of our sister States, even when they reach a different decision than we would have, are endowed with an equal measure of wisdom and sympathy." *Delk* v. *Gonzalez*, *supra* at 530.

It is not disputed that, at the inception of the Juvenile Court case, Maryland, and not Massachusetts, was the home State of the children, Maryland had made a prior custody determination, and Maryland custody proceedings (the CINA case) remained pending. Thus, the MCCJA, G. L. c. 209B, § 2(*a*)(3), provided the only basis for the Juvenile Court to exercise jurisdiction.[12] That section permits a Massachusetts court that is competent to

---

[11]The MCCJA is similar, but not identical, to the Uniform Child Custody Jurisdiction Act (UCCJA). See *Umina* v. *Malbica*, 27 Mass. App. Ct. 351, 354-356 (1989).

[12]The MCCJA either did not authorize, or it expressly prohibited, the assertion of jurisdiction in Massachusetts on any other ground. See generally *Umina* v. *Malbica*, *supra* at 358-359 & nn.7 & 8. Briefly stated, and without attempting to discuss all of the nuances contained in the MCCJA, Massachusetts lacked home State jurisdiction, see G. L. c. 209B, § 2(*a*)(1); Massachusetts could not assert jurisdiction by default or necessity where Maryland had home State jurisdiction and had not declined it, see § 2(*a*)(2) and (4); Massachusetts could not exercise jurisdiction where Maryland was doing so consistently with the principles of the UCCJA and MCCJA in a pending case, except to the extent permitted in cases of abandonment or emergency under

hear child custody matters (such as the Juvenile Court) to assert jurisdiction to make an initial custody determination or, as is relevant here, to modify an existing custody determination if "the child is physically present in the Commonwealth and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child from abuse or neglect or for other good cause shown." G. L. c. 209B, § 2(*a*)(3), inserted by St. 1983, c. 680, § 2.

Leaving aside whether this was, in fact, a case of abandonment or emergency, we first must consider whether the exercise of jurisdiction under § 2(*a*)(3) of the MCCJA was compatible with the requirements of the PKPA. Section § 1738A(a) of the PKPA specifically addresses modification jurisdiction, providing that "[t]he appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h) of this section, any custody determination or visitation determination made consistently with the provisions of this section by a court of another State." Under § 1738A(a) of the PKPA, the December 6, 2002, order of the Caroline County court, committing the children to the care and custody of the grandmother, subject to the supervision of Baltimore City DSS, was a custody determination made "consistently with" the PKPA.[13] Section 1738A(a) of the PKPA

§ 2(*a*)(3), see § 2(*d*); and Massachusetts could not modify Maryland's existing custody order, see § 2(*e*).

[13]Section 1738A(c) of the PKPA explains that a child custody or visitation determination is "consistent with" the provisions of the PKPA if the order is made by a court having jurisdiction under its own State's law, and one of several alternative conditions is met. One of these conditions is that the State in which the order is made is the "home State" of the child on the date of the commencement of the proceeding. 28 U.S.C. § 1738A(c)(2)(A)(i). As defined in the PKPA, the child's "home State" is the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months. 28 U.S.C. § 1738A(b)(4). It is not contested that Maryland was the children's PKPA "home State" at the commencement of the Maryland CINA proceedings and that Maryland also had home State jurisdiction under its own law. At the time, the governing child custody jurisdiction statute in Maryland was the Uniform Child Custody Jurisdiction Act (UCCJA). See Md. Code (Family Law) §§ 9-201 to 9-224 (1999). Maryland later adopted the revised and renamed version of the UCCJA, the Uniform Child Custody Jurisdiction Enforcement Act (1997) (UCCJEA), effective as to custody cases filed on or after October 1, 2004. 2004 Md. Laws c. 502.

therefore required Massachusetts to enforce, and prohibited Massachusetts from modifying, the Maryland custody order, unless an exception applied.

Whether the PKPA contains an exception for abandonment or emergency analogous to that of the MCCJA is a matter of controversy. Only three particular subsections are identified in the "except" clause of § 1738A(a). The first, § 1738A(f), authorizes the exercise of modification jurisdiction if the modifying State has jurisdiction under its own law to make such a child custody determination, and the original State no longer has jurisdiction, or has declined to exercise jurisdiction to modify its original order. The second, § 1738A(g), is not truly an exception, but rather an explicit prohibition on the exercise of jurisdiction in any proceeding for a custody or visitation determination that is commenced during the pendency of a custody proceeding in another State that is exercising jurisdiction consistently with the PKPA. The third subsection in the "except" clause, § 1738A(h), relates only to the modification of visitation determinations and has no relevance here.

Were these the only provisions of the PKPA to be taken into account, the Juvenile Court unquestionably would have been required to refrain from exercising jurisdiction from the very outset of the case. Section 1738A(f) provided no basis for modification in Massachusetts of a Maryland custody order where Maryland continued to have home State jurisdiction and had not declined to exercise jurisdiction to modify its order. Moreover, the custody of the children remained the subject of a pending Maryland case. Thus, the exercise of jurisdiction over the custody of the children, whether in the context of the aunt's petition for guardianship or the department's care and protection case, was expressly prohibited by § 1738A(g).

The appellees (the department and the children) rely upon § 1738A(c)(1) and (2)(C)(i) and (ii) of the PKPA for the proposition that there is another exception permitting a subsequent State court to modify a prior State's PKPA compliant custody order in cases of abandonment or emergency. These sections provide that a child custody or visitation determination made by a State court will be deemed "consistent with" the provisions of the PKPA if such court has jurisdiction under its own law, § 1738A(c)(1), the child is physically present in that State, and

"(i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because the child, a sibling, or parent of the child has been subjected to or threatened with mistreatment or abuse," § 1738A(c)(i) & (ii). The countervailing position, argued by the appellants, is that § 1738A(c) and its subsections relate only to whether another State's original custody order is entitled to full faith and credit — and that the PKPA clearly and unequivocally permits modification of a PKPA compliant order in a second State only where the first State no longer has jurisdiction or has declined jurisdiction, and not in a case where PKPA compliant custody proceedings are pending elsewhere.

Although the appellants' position has some support elsewhere,[14] we think it has been foreclosed by the Supreme Judicial Court. In *Care & Protection of Vivian*, 420 Mass. at 885 n.5, quoting from § 1738A(c)(1)(c),[15] the court expressed the view that if a child "has been abandoned" or "it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse," a Massachusetts court would be able to exercise jurisdiction notwithstanding pending custody proceedings elsewhere. Likewise, in *Delk* v. *Gonzalez*, 421 Mass. at 534 n.9, the court noted that an emergency as defined in § 1738A(c)(2)(C)(ii) of the PKPA creates an exception to the mandate of the PKPA that a second State refrain from modifying a PKPA compliant custody determin-

---

[14]See Haralambie, Handling Child Custody, Abuse and Adoption Cases §§ 2.09 & 2.26 (1993 and Supp. 2007-2008).

[15]*In Care & Protection of Vivian*, *supra* at 879, the full court answered in the negative a question reported to it by a single justice, i.e., whether, in light of the PKPA, a Massachusetts court could properly consider and decide a non-emergency care and protection proceeding when custody proceedings concerning the child were pending in another State that had jurisdiction over the child custody question. Because the other State, Utah, already had issued a temporary custody order consistent with the requirements of the PKPA, the court held that Massachusetts was required, under the terms of the PKPA, to enforce the Utah order and was prohibited from modifying it. *Id.* at 881-882. The court explicitly noted, however, that its negative answer to the reported question would not apply in the situations addressed by PKPA, § 1738A(c)(1) and (2)(C)(i) and (ii) — where the child in question "has been abandoned" or "it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse." *Id.* at 885 n.5. (We discuss the circumscribed scope of emergency jurisdiction, *infra*.)

ation. We therefore proceed on the basis that it was permissible under the PKPA for the Juvenile Court to exercise jurisdiction under the MCCJA if the children were abandoned or it was necessary in an emergency to protect them because one or both of them were subjected to or threatened with mistreatment or abuse. It is the PKPA's formulation of emergency that is controlling, irrespective of the broader emergency jurisdiction of the MCCJA (if necessary "to protect the child from abuse or neglect or for other good cause shown"). *Delk* v. *Gonzalez, supra* at 531. G. L. c. 209B, § 2(*a*)(3)(ii).

That said, there remain questions whether there was abandonment or emergency of the requisite character. In the analysis of jurisdiction performed by the judge when she denied the appellants' motion to vacate the decrees, she concluded that these criteria were met, relying upon (1) her trial finding that the children had been "abandoned" by the grandmother, in that she had left the children with the aunt intending the aunt to become their permanent caretaker; and (2) the fact that the children had come before the court "because of allegations of abuse and neglect."

We think it questionable, however, whether there was abandonment in the legal sense required to permit the exercise of jurisdiction. It has been held that the voluntary, physical relinquishment of a child by one with legal rights to the child is insufficient to warrant the exercise of jurisdiction on the grounds of abandonment, at least in circumstances where one parent has left the child with another parent. See *Guardianship of Zeke*, 422 Mass. 438, 444-445 (1996). Furthermore, the judge did not, and, on this record, could not find that the grandmother had abandoned the children either within the meaning of G. L. c. 273, § 1 (criminal child abandonment means that the child was left without making reasonable provisions for support), see *ibid.*, or within the meaning of G. L. c. 210, § 3(*c*) (defining "abandoned" as "being left without any provision for support and without any person responsible to maintain care, custody and control because the whereabouts of the person responsible therefor is unknown and reasonable efforts to locate the person have been unsuccessful").

More fundamentally, even if the grandmother did abandon the children in a legal sense, the children were committed to her

care subject to the supervision of the Baltimore City DSS and the Baltimore City Court. That being the case, abandonment by the grandmother did not create an occasion for the Massachusetts courts to adjudicate the children's custody; it merely required that the children be returned to Baltimore City DSS — the matter of the children's placement being left to that agency and to the Baltimore City Court.

The propriety of the court's original assumption of jurisdiction on the ground of emergency stands on firmer footing. At the time of the removal hearing, the department was investigating the grandmother's allegation of abuse by the aunt[16] and the aunt's counter-allegation of abuse by the grandmother, in the context of an escalating standoff as to which of them should have physical custody of the children. Thus, while it would have been preferable for the judge to have made explicit and contemporaneous jurisdictional findings at the time of the removal hearing,[17] the judge reasonably could have decided, based upon what was made known to her at that time, that it was necessary to exercise emergency jurisdiction for the purpose of protecting the children from threatened mistreatment or abuse, as permitted by the PKPA.

At that point, however, because Maryland had home State jurisdiction, not to mention a pending custody case and an outstanding custody order, emergency jurisdiction in Massachusetts was "limited to issuing temporary orders designed to effectuate [Maryland's] exercise of jurisdiction, yet keep the child[ren] safe." *MacDougall* v. *Acres*, 427 Mass. 363, 369 (1998). G. L. c. 209B, § 2(*a*)(3). Consistent with this limitation, the Juvenile Court judge could have ordered the department to make arrangements with Baltimore DSS to facilitate the safe transfer of the children to Maryland and the jurisdiction of the Baltimore City Court. The judge also could have contacted the Baltimore

---

[16]As reflected in the G. L. c. 119, 51B, report, as of August 7, 2003, the department reached the conclusion that any allegation of physical abuse of Yvette by the aunt was unsupported. The department worker accepted as true that Yvette's black eye was the result of Frank hitting her, as the children tended to be rough with one another. This conclusion was not reached, however, until after the children were removed from the aunt's home.

[17]Because the question of jurisdiction was readily apparent from the inception of the case, it would have been appropriate for the judge explicitly to consider whether the exercise of jurisdiction was proper, even though the parties did not raise the issue at that time.

City Court to express concerns that the children were at risk, see *Archambault* v. *Archambault*, 407 Mass. 559, 570 n.5 (1990); to obtain a temporary order for change of custody or a temporary declination of jurisdiction in favor of Massachusetts, see *Umina* v. *Malbica*, 27 Mass. App. Ct. 351, 359 & n.10 (1989); or otherwise to determine and act in accordance with the wishes of the Baltimore City Court.[18] However, it was not permissible for the Juvenile Court to proceed unilaterally and indefinitely with the care and protection case.

In her decision denying the appellants' motions to vacate, the judge justified the continued exercise of jurisdiction from July 31, 2003, when the removal hearing was held, through May 6, 2004, when the Baltimore City Court terminated its jurisdiction, on the ground that "Maryland was on notice that emergency custody orders were being issued out of Massachusetts, and at no point contested Massachusetts' jurisdiction." There is, however, no indication that the Baltimore City Court, as distinct from Baltimore DSS, had knowledge of the Massachusetts court proceedings until many months had gone by.[19] In any event, the Juvenile Court could not exceed the limited scope of emergency

---

[18]The MCCJA expressly permits communication and cooperation with the courts of other States in interstate custody cases. See G. L. c. 209B, § 7(*c*) (authorizing the communication and exchange of information relevant to deciding whether a Massachusetts court is "the appropriate forum"); § 10(*a*) (authorizing a Massachusetts court to request another State court to hold a hearing to adduce evidence, order a party to produce or give evidence, or have an investigation made with respect to a custody case pending in Massachusetts). The original UCCJA as well as the revised and renamed Uniform Child Custody Jurisdiction Enforcement Act (1997) (UCCJEA) also encourage intercourt communication.

While the precise method for intercourt communication may vary, the procedures employed should provide for an appropriate level of participation by the parties and the creation of a record for appeal. See Haralambie, Handling Child Custody, Abuse and Adoption Cases § 2.14 (1993 & Supp. 2007-2009). See also UCCJEA § 110.

[19]So far as the record reveals, there never was any court to court contact in this case. The earliest indication in the record that the Baltimore City Court was even aware that the children were in Massachusetts is the order following its December, 2003, status hearing, in which it is noted that the children were "in the equivalent of shelter care" in Massachusetts. However, this order does not explicitly mention or acknowledge the involvement of a Massachusetts court. Even if the Baltimore City Court could have inferred from the children's placement in foster care that a Massachusetts court must have intervened, the Baltimore City Court's order does not support the view that it acquiesced in

jurisdiction simply because the courts in Maryland did not object. A temporary order was all that the Juvenile Court had authority to enter, unless Maryland expressly declined jurisdiction. See *Orchard* v. *Orchard*, 43 Mass. App. Ct. 775, 780 (1997).

This brings us to the May 6, 2004, order of the Baltimore City Court terminating its jurisdiction in favor of Massachusetts. Here, the appellants' positions diverge. The aunt claims that the Baltimore City Court order should not be honored because it was based upon the unchallenged representations of the department's attorney, as recounted in the motion brought by Baltimore DSS. See note 7, *supra*. However, regardless of the degree of the aunt's participation in the Massachusetts case, she has no standing to complain about the proceedings in the Baltimore City Court CINA case, where she was not a party.[20]

The grandmother claims that the Baltimore City Court order should not be viewed as curative, because, by the time it was issued, she already had been prejudiced in her efforts to resume guardianship of the children by having to travel to Massachusetts for visits and hearings and being required to undergo an Interstate Compact home study. However, despite the fact that she was the only appellant who participated in and was fully informed about both sets of proceedings — with notice and opportunity to be heard in both courts — it has not been made to appear that the grandmother ever objected to the entry of the Baltimore City Court order; nor did she object to the Juvenile Court's reliance upon that order until she joined in the motion to vacate on March, 2007, one and one-half years after the case was tried to a conclusion. We consider the grandmother's argument to be made too late.

Both parents contended below that the Baltimore City Court order was invalid and should not have been given full faith and

---

the assumption of jurisdiction in Massachusetts. To the contrary, the Baltimore City Court continued to exercise its own jurisdiction, ordering that no changes be made to existing Maryland orders and resetting the matter for future review. The Baltimore City Court then continued to keep the matter active and under review until May 6, 2004, when Baltimore City DSS reported that the children were "under the jurisdiction of the Massachusetts Courts."

[20]Without passing on the aunt's argument, we note that the issue she raises would have been obviated had there been court-to-court contact. See note 18, *supra*.

credit in Massachusetts, because it was issued in violation of their rights to due process. But only the mother makes this argument on appeal, pointing out that she was not served with the motion that led to the termination of jurisdiction and that she had no notice of the hearing on the motion or opportunity to be heard before the Baltimore City Court decided the issue.[21] Had these concerns been raised in a timely fashion, they would have deserved further examination. See generally *Griffin* v. *Griffin*, 327 U.S. 220, 229 (1946) (full faith and credit may not be given to judgments obtained in violation of procedural due process). As it stands, however, the issue was not preserved.

In her decision denying the appellants' motions to vacate, the judge found that all parties to this case were made aware of the May 6, 2004, order. Yet, nowhere in the record does it appear that any party, including the mother, objected to the completion of the case in Massachusetts, whether on the ground that the Baltimore City Court·order was not entitled to full faith and credit in Massachusetts, or on any other ground. Nor does it appear that, after learning of the May 6, 2004, order, any party, including the mother, sought relief in the Baltimore City Court. It was not until March, 2007, when the appellants filed their joint motion to vacate on jurisdictional grounds that due process concerns associated with the Baltimore City Court order were brought to the Massachusetts court's attention. Meanwhile, by the end of 2005, the case had been tried to a conclusion.

Particularly in a time sensitive case like this one, involving the custody of children in foster care, such delay was inexcusable. The Juvenile Court judge was not required to consider the due process issue, nor are we. See *Ballerino* v. *Ballerino*, 436 Mass. 1005 (2002) (affirming denial of posttrial motion claiming violation of due process, where issue was not timely raised). See also *Guardianship of Enos*, 41 Mass. App. Ct. 360, 362 (1996) (refusing to entertain argument that Florida guardian-

---

[21]The department contends that, under Maryland law, the parents were obliged to keep the court and the local child welfare authorities apprised of their whereabouts and that we may infer that the parents must not have complied. The department also suggests that the father would have had actual notice of the May 6, 2004, hearing through the grandmother, with whom he may have been living at the time. We decline to draw these conclusions, as they are without record support.

ship decision was not entitled to full faith and credit where it was not raised below and where it was not shown that it could not be addressed in Florida).

The mother also frames her argument in terms of ineffective assistance of trial counsel.[22] A claim of ineffective assistance in the context of care and protection proceedings is considered under the standards applicable to judging the effectiveness of counsel's assistance in criminal cases. See *Care & Protection of Stephen*, 401 Mass. 144, 149-150 (1987). "First, we look to determine whether the 'behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer' and, if so, we further inquire 'whether [counsel's conduct] has likely deprived the defendant of an otherwise available, substantial ground of defence.' " *Id.* at 149, quoting from *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).[23] Where a strategic choice is at issue, "[a]n attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). *Adoption of Rhona*, 63 Mass. App. Ct. 117, 130 (2005).

We have no basis to conclude that the decision by the mother's counsel not to question the Juvenile Court's exercise of jurisdiction was anything but tactical.[24] In view of the comments voiced by counsel for the father and the grandmother at the September 5, 2003, temporary custody hearing, as well as the judge's statement at the November 3, 2003, status conference that the question of jurisdiction should be asserted by motion, all counsel present on those occasions (including counsel for the mother) were aware that there was a jurisdictional issue in the case, but nevertheless did not pursue it. Where the Maryland courts already

[22]The mother preserved the issue below by filing, jointly with the father, a second, separate motion seeking to vacate the decrees, or in the alternative, a new trial. See *Care & Protection of Stephen*, 401 Mass. 144, 150 (1987). On appeal, the father no longer makes this argument.

[23]As to the second part of the test, in the context of care and protection and termination of parental rights proceedings it is preferable to inquire whether counsel's conduct "prejudice[d]" the party making the claim. *Care & Protection of Georgette*, 439 Mass. 28, 33 n.7 (2003).

[24]The joint motion to vacate on ineffective assistance grounds is not supported by any affidavits from trial counsel.

had found the children's parents "unable to give the [children] proper care and attention without the assistance of this Court," counsel for the mother may well have decided that the mother would fare better in a new forum where she could present herself in a fresh light. We are unconvinced that such a strategy would have been manifestly unreasonable.

In any event, even if the mother's counsel was ineffective in failing to press the jurisdictional issue and, more particularly, in failing to assert that the Juvenile Court should not honor the Baltimore City Court order terminating its jurisdiction, the judge was entitled to conclude that the mother failed to establish that the error affected the outcome of the case. In an affidavit supporting her posttrial motions, the mother averred that, because of her ties to Maryland, she had "many more opportunities to complete tasks necessary to successfully reunite with [her] children in Maryland." However, the judge was entitled to reach a different conclusion.

The record establishes and the judge found that the mother moved from Maryland to Delaware in August, 2003, on the day after the children were removed from her care. She lived in Delaware for eight months, then married and moved with her husband to Florida, where she resided when the Massachusetts care and protection case began. The mother remained in Florida until June, 2005, when she and her husband returned to Maryland. Thus, whether the case went forward in Maryland or Massachusetts, the mother would have faced hurdles arising from her distance from the children. And in either case, the Florida child welfare authorities would have been involved in assessing the suitability of placing the children in her care. The Florida authorities performed two home studies of the mother, both of which found that she was an unacceptable placement for the children. Thus, even if counsel had succeeded in having the case sent back to the Baltimore City Court, it is improbable that the mother's custody would have been restored.

In sum, the appellants' arguments with respect to the Baltimore City Court's order are unavailing. Maryland's declination of jurisdiction in favor of Massachusetts had the effect of conforming the case to the requirements of the MCCJA and the PKPA. See G. L. c. 209B, § 2(d); 28 U.S.C. § 1738A(f)(2). The order

was curative and obviates any need to vacate the decrees on jurisdictional grounds.

*Conclusion.* For the reasons stated herein and in the companion memorandum and order pursuant to rule 1:28 issued today, we affirm the decrees, as well as the denial of motions (1) seeking to vacate the decrees based on lack of jurisdiction and (2) seeking to vacate the decrees and for a new trial based on ineffective assistance of counsel. We also affirm the orders denying the petitions for guardianship.[25]

*So ordered.*

---

[25]Our memorandum and order issued this date addresses additional arguments raised by the mother, the father, and the grandmother with respect to the decrees; by the mother with respect to the denial of her motion to vacate or for a new trial on the ground of ineffective assistance of counsel; and by the aunt with respect to her guardianship case and her status as a party in the termination case.