NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1611                                          Appeals Court

ADOPTION OF ANISHA.[1]


No. 15-P-1611.

Suffolk.     May 12, 2016. – August 5, 2016.

Present:  Kafker, C.J., Cohen, & Green, JJ.


Massachusetts Child Custody Jurisdiction Act.  Jurisdiction,
     Care and protection of minor, Custody of child, Juvenile
     Court.  Juvenile Court, Jurisdiction.  Parent and Child,
     Care and protection of minor, Custody.  Minor, Care and
     protection, Custody.


     Petition filed in the Suffolk County Division of the
Juvenile Court Department on December 18, 2013.

     The case was heard by Stephen M. Limon, J.


     Sherrie Krasner for the mother.
     Ashley M. Green for the child.
     Kerry David Strayer, Assistant Attorney General, for
Department of Children and Families.


     KAFKER, C.J.  The primary issue presented in this appeal is

whether a judge of the Juvenile Court properly exercised

jurisdiction over a care and protection petition regarding an

_____

     [1] A pseudonym.

infant where the mother, who had previously lost custody of six older children, secreted the child out of the Commonwealth and then the United States to avoid oversight by the Department of Children and Families (DCF).  We conclude that the judge properly denied the mother's motion to dismiss for lack of jurisdiction while he further explored the issue of which State -- Tennessee or Massachusetts -- had jurisdiction, and that he correctly exercised jurisdiction pursuant to G. L. c. 209B, § 2(a)(4), once Tennessee declined jurisdiction.  We also conclude that there was overwhelming evidence to support the judge's determination that the mother was unfit to parent the child, and we therefore affirm the decree terminating the mother's parental rights.[2]  See G. L. c. 119, § 26; G. L. c. 210, § 3.

1.  Background.  We recite the procedural history and the relevant facts as found by the judge, reserving additional facts for our discussion of the legal issues.

a.  Child's birth and DCF's response to G. L. c. 119, § 51A, report.  The mother was returning to Massachusetts from her father's funeral in Maine when she went into labor.  She gave birth to the child at a hospital in New Hampshire in November, 2013.  The judge found that the child was the

---

[2] The father stipulated to his unfitness and the termination of his parental rights, and he is not a party to this appeal.

3

"[m]other's eighth child and . . . none of the older seven [were] in her care and custody following the untimely death of one and the removal of the other six older children by [DCF]." After the child's birth, the mother completed a form with information from which the child's birth certificate would be prepared by New Hampshire officials. The mother reported on that form that her address was in Columbus, Georgia, but she provided a mailing address of a post office box in the Mattapan section of Boston. Although the mother asserted that she had moved to Georgia at the beginning of 2013, the judge rejected that assertion and found that the mother continued to reside in Massachusetts until the child was born. The mother and the child were discharged from the hospital on November 22, 2013. The mother had scheduled an appointment for the child on November 22 at Cambridge Health Alliance in Cambridge, but she did not appear at that appointment.

At birth, the child tested positive for cocaine. A mandated reporter filed a report with the New Hampshire child protection agency and another report was filed in Massachusetts pursuant to G. L. c. 119, § 51A (51A report). Among other things, the 51A report alleged that the child was neglected, that she had tested positive for cocaine, and that the mother planned on staying with the child in Cambridge, with the maternal aunt, after discharge from the hospital. Based on the

51A report, DCF began an investigation pursuant to G. L. c. 119, § 51B. DCF attempted to locate the mother and child and planned to remove the child from the mother's custody on an emergency basis. DCF failed to locate the mother in Massachusetts but eventually learned that the Boston police department had a record of recent interactions with her, including responding to a violent incident on September 4, 2013, involving the mother and another woman at the mother's last known Mattapan address.

The judge found that shortly after the child's birth, the mother "took [the child] with her to Tennessee, perhaps with a brief stop first in Miami and/or Georgia." The father reported to DCF that the mother intended to place the child in the custody of the paternal aunt.

b. Custody proceedings in Tennessee and Massachusetts. The mother filed a petition on December 4, 2013, in Hamilton County, Tennessee, seeking the appointment of the paternal aunt as guardian of the child. On December 13, 2013, DCF contacted MassHealth and learned that the mother maintained MassHealth insurance for herself but that the child was not named as an insured. The address the mother used for MassHealth was the Mattapan one. Still unable to locate the mother or the child, DCF filed a care and protection petition in the Juvenile Court on December 18, 2013. See G. L. c. 119, § 24. On December 30, 2013, the judge held a preliminary hearing on the petition. At

that hearing, DCF introduced affidavits describing the child's birth in New Hampshire, the mother's and father's residences and connections to Massachusetts, and the mother's plans to take the child out of State and place her in the custody of the paternal aunt.  The mother's counsel made an oral motion to dismiss the petition, claiming that the court did not have jurisdiction over the child because she was not born in Massachusetts and there was no evidence that she was in Massachusetts.  The mother's counsel also represented that the child was in St. Kitts, West Indies, with the paternal aunt.  The judge prepared what he referred to as a "draft" memorandum of decision on the motion to dismiss, dated December 31, 2013, setting forth his concerns regarding the child's safety and noting that his concerns were "heightened by the lack of clarity relative to jurisdiction." He reviewed possible jurisdiction in both Massachusetts and Tennessee and the nuances in the law regarding both given the child's age -- less than two months old -- and lack of home State.  He concluded:

> "[I]ntervention relative to the question of custody of [the child] remains to be determined.  In the meantime the question of jurisdiction needs to be resolved [footnote omitted].
>
> "For the above reasons Mother's oral Motion to Dismiss this petition hereby is denied without prejudice.  Further, in order to begin the process of deciding the jurisdiction issue, I hereby order the Clerk Magistrate of the Suffolk County Juvenile Court to forward a copy of this Memorandum of Decision to Special Magistrate Rachel Brock of the

Juvenile Court for Hamilton County, Tennessee. This communication with the court in another jurisdiction is expressly permitted under G. L. c. 209B, § 7(f)."[3]

The judge sent a letter, with the memorandum of decision, to the special magistrate in Tennessee, requesting that she review it so that they could "discuss how best to proceed." In early January, 2014, the judge telephoned the special magistrate.[4] The special magistrate in Tennessee "declined jurisdiction over the guardianship petition for lack of personal connection of either Mother or child to Tennessee."[5] On January 6, 2014, the trial judge "filed" his December 31, 2013, memorandum of decision denying the mother's motion to dismiss without prejudice, and it was entered on the docket.

---

[3] Section 7(f), inserted by St. 1983, c. 680, § 1, provides that "[a] court shall communicate to the court of any other relevant jurisdiction any determination or finding made pursuant to this section."

[4] Such contact was proper pursuant to G. L. c. 209B, § 7(c), inserted by St. 1983, c. 680, § 1, which provides that "[i]n order to determine whether it is the appropriate forum, a court of the commonwealth may, in its discretion, at any time during the pendency of the custody proceeding, communicate and exchange information with a court or courts of any other relevant jurisdiction."

[5] The mother's concerns that this communication was not in writing are unavailing. The judge and the special magistrate were not required to resolve the jurisdictional issue in writing and were permitted to decide that issue over the telephone. Redding v. Redding, 398 Mass. 102, 105 n.3 (1986) ("[I]n cases such as this it seems appropriate to use the telephone as the means of communication"). See Custody of Brandon, 407 Mass. 1, 5 & n.3 (1990); E.N v. E.S., 67 Mass. App. Ct. 182, 186 n.12 (2006).

c.  Termination of the mother's parental rights.  On January 24, 2014, the judge held a lobby conference with the parties and issued an order directing the mother and father to take "whatever steps are necessary" to see that the child was returned to Massachusetts.  On March 11, 2014, the paternal aunt brought the child before the Massachusetts court to allow the child to be identified.  After a custody hearing, the judge granted temporary custody of the child to DCF, and she was placed in a foster home.

A home study of the paternal aunt and her husband (uncle) was requested by DCF and performed by the St. Kitts Office of Probation and Child Services.  DCF received the favorable home study results on March 19, 2014.  The judge ultimately approved placing the child with the paternal aunt and uncle.

Because the mother had failed to make adequate progress in utilizing available services that might have led to her reunification with the child, on May 6, 2014, DCF changed its plan for the child from reunification to adoption.  At a pretrial conference on October 17, 2014, the mother decided to proceed pro se, and her attorney was allowed to withdraw.  The mother then filed documents that the judge construed as a renewed motion to dismiss for lack of jurisdiction.  On October 20, 2014, the judge denied that motion.  The mother subsequently reengaged her former attorney, and the case was tried on March

19, 2015. Following trial, the judge terminated the mother's parental rights, and the mother filed a timely notice of appeal.

On November 10, 2015, the judge issued his findings of fact and conclusions of law. The judge found that the "Mother, abetted by Father, engaged in a series of actions, inactions, deceit, and misdirection, designed to avoid the scrutiny of [DCF] in the several months after [the child's] birth by secreting [the child] out of Massachusetts and ultimately outside of the United States" to stay with the paternal aunt in St. Kitts. The judge also found that the paternal aunt and uncle were not involved in this attempt to evade DCF. At the outset of his findings, the judge stated that "[t]his case in a nutshell is about whether Mother, who had lost custody of her six older children in previous care and protection cases, due to her mental health, substance abuse, and domestic violence issues, would be able to engage in and benefit from services such that she could overcome those longstanding issues and reunify with [the child]." The judge concluded that the mother would not benefit from additional services and that the child "would be endangered" if placed back in the mother's care. The judge applied the statutory factors required by G. L. c. 210, § 3(c), in determining that the best interests of the child would be served by termination of the mother's parental rights.

The judge approved DCF's plan for adoption of the child by the paternal aunt and uncle.

2. Discussion. a. The judge properly denied the motion to dismiss for lack of jurisdiction. "In Massachusetts, jurisdiction over child custody proceedings possibly involving the jurisdictional claims of other States is determined according to G. L. c. 209B[, the Massachusetts Child Custody Jurisdiction Act (MCCJA)]." Custody of Brandon, 407 Mass. 1, 5 (1990). "Under the statute, a court must determine whether it has the power to exercise jurisdiction in a custody proceeding and, if so, whether it should exercise that power under the standards provided in the statute." Ibid. These determinations were complicated in the instant case by the uncertainties regarding the child's location, the mother's disappearance from Massachusetts and movements around the country apparently to avoid DCF oversight, the filing of the guardianship petition in Tennessee, and, most importantly, the child safety concerns raised by the mother's troubled history with her older children in Massachusetts.

The judge acted well within his statutory and inherent authority in denying the mother's motion to dismiss while he further explored the question of which State -- Tennessee or Massachusetts -- had jurisdiction. Most importantly, no custody decisions were made until jurisdiction in Massachusetts was

established.  Rather, the judge simply kept the case open while the jurisdictional issue between Tennessee and Massachusetts was analyzed and resolved.  "[B]y the time the judge made his custody determination, [the Tennessee court had declined jurisdiction and] . . . the conditions of [G. L. c. 209B,] § 2(a)(4) had been met."  Redding v. Redding, 398 Mass. 102, 106 (1986).

Moreover, the preliminary actions the judge took to explore and resolve the jurisdictional question were expressly authorized by the MCCJA.[6]  The MCCJA "encourage[s] communication, cooperation, and mutual assistance between courts and seek[s] to avoid jurisdictional competition and conflict."  Redding, supra at 105.  See Custody of Victoria, 473 Mass. 64, 68 (2015) (purpose of MCCJA, as well as other States' acts governing

_____

[6] We also note that courts in the Commonwealth "have both the power and the obligation to resolve questions of subject matter jurisdiction whenever they become apparent."  Nature Church v. Assessors of Belchertown, 384 Mass. 811, 812 (1981).  As the United States Supreme Court has explained, courts "always [have] jurisdiction to determine [their] own jurisdiction."  United States v. Ruiz, 536 U.S. 622, 628 (2002).  See 13D Wright, Miller, Cooper, & Freer, Federal Practice and Procedure §§ 3536-3537 (2008) ("jurisdiction to determine jurisdiction").  See also Foley v. Foley, 156 N.C. App. 409, 412 (2003) ("[A] court has inherent power to inquire into, and determine, whether it has jurisdiction and to dismiss an action [sua sponte] when subject matter jurisdiction is lacking" [quotation omitted]).  See generally Restatement (Second) of Judgments § 11 & comment c (1982) (discussing court's power to inquire into limits of its own jurisdiction); Coombs, Interstate Child Custody: Jurisdiction, Recognition, and Enforcement, 66 Minn. L. Rev. 711, 846 (June, 1982) (discussing court's "jurisdiction to determine its own jurisdiction").

custody determinations, is to "encourage cooperation and avoidance of jurisdictional conflict between courts of different States in order to protect a child's welfare when litigating custody matters"). To that end, the MCCJA recognizes that in some cases, jurisdiction may not be clear and communications between courts of different States may be required before the question of jurisdiction can be definitively resolved. See G. L. c. 209B, §§ 2(d), 7(c), (f); Umina v. Malbica, 27 Mass. App. Ct. 351, 353 (1989) (discussing communications pursuant to § 7[c] and [f] between Massachusetts court and Colorado court in child custody case); Adoption of Yvette (No. 1), 71 Mass. App. Ct. 327, 342 n.18 (2008). As explained previously, the trial judge's communications with the special magistrate in Tennessee to address and resolve the jurisdiction question were expressly authorized by G. L. c. 209B, § 7(c). See note 4, supra.

b. The Massachusetts court had jurisdiction to decide the issue of the child's custody. After the special magistrate in Tennessee declined jurisdiction over the custody decision, the Juvenile Court judge's memorandum of decision denying the mother's motion to dismiss was docketed, and at a hearing on January 24, 2014, the judge informed the parties that he had assumed jurisdiction over the custody proceedings. We review this determination of subject matter jurisdiction de novo. See Opare's Case, 77 Mass. App. Ct. 539, 541 (2010).

"Under Massachusetts law, a court may exercise jurisdiction in a custody proceeding only under the provisions of G. L. c. 209B." Custody of Victoria, supra at 68. See MacDougall v. Acres, 427 Mass. 363, 366 (1998). General Laws c. 209B, § 2(a), inserted by St. 1983, c. 680, § 1, provides as follows:

"Any court which is competent to decide child custody matters has jurisdiction to make a custody determination by initial or modification judgment if:

"(1) the commonwealth (i) is the home state of the child on the commencement of the custody proceeding, or (ii) had been the child's home state within six months before the date of the commencement of the proceeding and the child is absent from the commonwealth because of his or her removal or retention by a person claiming his or her custody or for other reasons, and a parent or person acting as parent continues to reside in the commonwealth; or

"(2) it appears that no other state would have jurisdiction under paragraph (1) and it is in the best interest of the child that a court of the commonwealth assume jurisdiction because (i) the child and his or her parents, or the child and at least one contestant, have a significant connection with the commonwealth, and (ii) there is available in the commonwealth substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

"(3) the child is physically present in the commonwealth and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child from abuse or neglect or for other good cause shown, provided that in the event that jurisdictional prerequisites are not established pursuant to any other paragraph of this subsection and a court of another state shall be entitled to assert jurisdiction under any other subparagraph of this paragraph then a court exercising jurisdiction pursuant to this clause of paragraph (3) may do so only by entering such temporary order or orders as it deems necessary unless the court of the other state has declined to exercise jurisdiction, has stayed its proceedings or has otherwise

deferred to the jurisdiction of a court of the commonwealth; or

"(4) (i) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (1), (2) or (3), or another state has declined to exercise jurisdiction on the ground that the commonwealth is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that a court of the commonwealth assume jurisdiction."

We conclude that the judge properly exercised jurisdiction pursuant to G. L. c. 209B, § 2(a)(4).[7]

i. Home State jurisdiction. As an initial matter, we address the question of home State jurisdiction. See G. L. c. 209B, § 2(a)(1); Custody of Victoria, supra at 70. The term "home state" is defined in G. L. c. 209B, § 1, inserted by St. 1983, c. 680, § 1, as

"the state in which the child immediately preceding the date of commencement of the custody proceeding resided with his parents, a parent, or a person acting as parent, for at least 6 consecutive months, and in the case of a child less than 6 months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the 6-month or other period."

Here, the judge concluded in his memorandum and order denying the mother's motion to dismiss that the child had no home State under the MCCJA. This conclusion was correct. The child was approximately one month old at the time DCF filed the care and protection petition, was being moved from State to State, and

---

[7] The judge appears to have relied only on § 2(a)(4) to establish jurisdiction.

apparently was living in St. Kitts around that time.  Therefore, the judge could not have assumed jurisdiction pursuant to G. L. c. 209B, § 2(a)(1).

ii.  Appropriate forum jurisdiction.  "Massachusetts has the authority to exercise jurisdiction over a custody proceeding if '(i) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (1), (2) or (3), or another state has declined to exercise jurisdiction . . . and (ii) it is in the best interest of the child that a court of the commonwealth assume jurisdiction.'" MacDougall, supra at 369, quoting from G. L. c. 209B, § 2(a)(4). Because the child had no home State, and Tennessee declined jurisdiction, and no petitions had been filed in any other State, the requirements of the first clause of G. L. c. 209B, § 2(a)(4), were unequivocally established.  The question then becomes whether it was in the best interest of the child that a court of the Commonwealth assume jurisdiction.  Because G. L. c. 209B, § 2(a)(4), does not separately define "the best interest of the child," we apply the factors set forth in the definition of that phrase in G. L. c. 209B, § 2(a)(2).  Redding, 398 Mass. at 106.  "The child and at least one parent must have a 'significant connection' with the Commonwealth, and 'substantial evidence concerning the child's present or future care, protection, training, and personal relationships' must be

available here." Ibid., quoting from G. L. c. 209B, § 2(a)(2). See Custody of Victoria, 473 Mass. at 71 ("[I]n contrast to the definition of 'best interest of the child' generally applied in child custody litigation, the phrase as used in this context elevates the value of the child's connections to the Commonwealth in the jurisdiction calculus").

The judge's detailed findings of fact establish that these two best interest requirements have been satisfied. See Redding, supra ("The record . . . warrants the judge's implicit finding that the assumption of jurisdiction here was in [the child's] best interest"). We begin with the judge's findings that support the parties' significant connections to the Commonwealth. For the parents, this is straightforward. The mother's and father's connections to Massachusetts were significant. There is no dispute that the father was domiciled in Massachusetts. The judge described the mother as "a long-time resident of Massachusetts," and he found "that Mother remained a Massachusetts resident until [the child] was born."

The analysis of the child's connections to Massachusetts is more difficult. The child was about one month old at the time the care and protection petition was filed, thereby limiting the child's connections to any State. Nevertheless, the record on appeal and representations to this court sufficiently establish that the child also had a significant connection to the

Commonwealth. The judge concluded that the "Mother and [child] came to Massachusetts from New Hampshire when [the child] was born," before traveling thereafter to States in the South. In her appellate brief, the mother confirms that she came to Massachusetts just after the child was born, but she attempts to minimize her presence in Massachusetts "as a transit stop from New Hampshire to points south." The mother, however, concedes in her statement of facts that "[s]he [had] indicated that, upon discharge from the hospital [in New Hampshire], she would travel to Cambridge, Massachusetts to stay with her sister" (emphasis added). In support of this fact, the mother in her brief cites to information on the 51A intake report; that form includes the name of the mother's sister in Cambridge that she was going "to stay with." Based on the information on the intake form (including the sister's name, her relationship to the mother, and her city of residence), the sister identified on the form is clearly the same sister whom the mother subsequently brought to the attention of DCF and the judge between March 11, 2014, and March 28, 2014, as a potential temporary caregiver for the child. In addition to planning to travel to Cambridge to stay with her sister, the mother had also scheduled an appointment with the pediatric department of Cambridge Health Alliance for November 22, 2013, the same day as the mother and the child were discharged from the New Hampshire hospital. Although the mother

never appeared with the child at that appointment, the fact that the mother chose to schedule a pediatric follow-up visit in the Commonwealth, when taken together with the aforementioned facts, supports our conclusion that the mother and the child had a significant connection to the Commonwealth. See G. L. c. 209B, § 2(a)(4). See generally Custody of Victoria, 473 Mass. at 75 (discussing importance of location of child's health care in determining whether there is significant connection to jurisdiction).

All the evidence that DCF had gathered in its investigation of the 51A report in this case was located in the Commonwealth. Further, DCF had important, relevant records, gathered in prior care and protection proceedings, documenting the mother's troubled history of neglect of her other children. This constituted "substantial evidence concerning the child's present or future care" that the child was likely to receive if the child remained in the custody of the mother. Because, as the judge noted in his findings, the special magistrate in Tennessee had "declined jurisdiction over the guardianship petition for lack of personal connection of either Mother or the child to Tennessee," Massachusetts was "the more appropriate forum to determine the custody of the child, and . . . it [was] in the best interest of the child that a court of the commonwealth assume[d] jurisdiction." G. L. c. 209B, § 2(a)(4). Where all

of the prerequisites of G. L. c. 209B, § 2(a)(4), were met, the court had subject matter jurisdiction in the instant case.[8]

c.   The filing of the Tennessee petition did not bar the judge from ruling on the mother's fitness.   The mother's final claim on appeal is that "there was no basis for the state to adjudicate Mother unfit and to terminate her parental rights." The mother does not challenge as clearly erroneous the judge's numerous findings concerning her, nor does she contend that the judge's determination of unfitness was not supported by clear and convincing evidence.   Therefore, we need not reach those issues.[9]   Instead, the mother's argument is essentially that

---

[8] As we conclude that the court had jurisdiction pursuant to G. L. c. 209B, § 2(a)(4), we need not resolve whether the court had default jurisdiction pursuant to § 2(a)(2) or emergency jurisdiction pursuant to § 2(a)(3).   Neither DCF nor the child argued that the requirements of § 2(a)(2) were met.   As for § 2(a)(3), we note that the judge did not find that the "child [was] physically present in the commonwealth" at the time these proceedings were commenced, which is a requirement set out in the plain text of G. L. c. 209B, § 2(a)(3).   We recognize that the judge once referred in his findings to his having exercised "emergency" jurisdiction, but we do not interpret this to be an express reference to or reliance on G. L. c. 209B, § 2(a)(3), which the judge did not discuss.   Rather, it appears to be a colloquial description of the child custody emergency he was confronting and the jurisdictional analysis he was undertaking.

[9] We do note, however, that the judge made ample findings of the mother's shortcomings that led to the determination of unfitness, not the least of which was the event that triggered DCF's initial investigation:   the mother used cocaine and the child tested positive for cocaine at birth.   The mother concedes in her brief "that the trial court previously had adjudicated her unfit to care for other children."   She also explicitly chose not to contest certain of the trial judge's findings that

because she raced out of Massachusetts to deliver the child to the paternal aunt, who was subsequently determined to be a suitable caretaker, and because the mother attempted to do this prior to DCF's filing of the care and protection petition, the mother is thereby legally insulated from being found unfit and having her parental rights terminated by the judge. The cases cited by the mother do not support this proposition.

_____

the judge included to "to demonstrate Mother's long-term issues and patterns of behavior relative to her parenting." These findings include the following determinations, among many others: (1) the mother left some of her older children in the care of others without offering to assist in providing care or financial support for them, and in one case without even notifying the relative how long she intended to absent herself from the children; (2) the mother has had "violent toxic relationships with the men in her life"; (3) four restraining orders had been issued against the mother, including one obtained by the maternal grandmother in 1993; (4) one of the mother's children had died in 2007 of a heart-related malady after the mother "had failed to inform [that child's new physician] of [his] cardiac condition"; (5) the mother had, at times, failed to provide for the medical needs of some of her other children; and (6) the mother has a history of cocaine use, and at least one of her other children also tested positive for cocaine at birth.

The judge also made numerous findings specifically relevant to the mother's unfitness to care for the child. The judge found that the mother has a "pattern of not taking personal responsibility for her actions or inactions," and that the "[m]other had made little if any progress in utilizing services towards the goal of reunification" with child. For example, the mother was granted Skype visits with the child while the child was with the paternal aunt and uncle, but the mother was frequently late to these visits or missed them altogether. The mother did not begin to fully comply with some of her DCF service plan tasks until approximately one and one-half months prior to the beginning of the trial. The mother also failed to submit to drug screenings that met the parameters of the screenings required in her service tasks.

For example, the mother relies on Freeman v. Chaplic, 388 Mass. 398, 407 (1983), for the proposition that "in certain circumstances a parent may . . . nominate a relative or friend to care for [a] child.  In the absence of unfitness of such nominees the State's interest to justify intervention on behalf of the child is de minimis" (quotation omitted).  The court, however, qualified that language by further stating that "[a]s a general matter, granting custody to a party opposed by the parents where neither the parents nor the parents' nominee is unfit or unsuitable, would not measurably advance any interest of the State and would raise serious constitutional difficulties."  Ibid.  In the instant case, the judge found that the child "was endangered while in Mother's care" and then determined pursuant to G. L. c. 119, § 26, that the child was in need of care and protection.  The judge further determined that the mother was unfit.  Moreover, the mother had secreted the child out of the country to caretakers who had not yet been evaluated by any court or agency.  In such circumstances, the Commonwealth's interest in who was granted custody over the child was substantial, not de minimis.  Compare Freeman, supra.

Additionally, the judge did not "grant[] custody to a party opposed by the parents."  See ibid.  The child was ultimately placed with the paternal aunt and uncle after a favorable home study.  The father entered into an open adoption agreement with

the paternal aunt and uncle; he also stipulated to judgment and to termination of his parental rights.  Prior to the filing of the care and protection petition, the mother had been in the process of placing the child in a guardianship with the paternal aunt, and the judge did not credit the mother's claim that she only intended that the guardianship be temporary.  If anything, the parents had jointly agreed to allow the paternal aunt to assume custody of the child.[10]

The mother's claim that this case was a "[p]recipitate attempt[] to force adoption over parental objection" is similarly without merit.  See Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975).  The record on appeal reflects the mother's long and troubled history of unfitness as a parent, and she was provided with "ample opportunity to demonstrate an ability to provide proper care for" the child, but failed to do so.  Ibid.  DCF's actions here were hardly precipitate; they were entirely foreseeable and well-considered.  "Other points, relied on by [the mother] but not discussed in this opinion, have not been overlooked.  We find nothing in them that requires

---

[10] It is noteworthy that, at the mother's request, DCF also attempted to conduct a home study of the maternal aunt as a potential caretaker for the child, but the maternal aunt failed to sufficiently cooperate with DCF to complete the home study.

discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).

Decree affirmed.