SUPREME JUDICIAL COURT 
 
 CARE AND PROTECTION OF FARAJ[1]

 
 Docket:
 SJC-13758
 
 
 Dates:
 May 7, 2025 – August 8, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Child Custody Jurisdiction Act. Jurisdiction, Custody of child, Care and protection of minor, Nonresident, Juvenile Court. Juvenile Court, Jurisdiction. Minor, Custody, Care and protection. Parent and Child, Custody, Care and protection of minor. Practice, Civil, Care and protection proceeding, Motion to dismiss. Department of Children & Families.
 
 

       Petition filed in the Hampden County
Division of the Juvenile Court Department on July 29, 2024.
           
A motion to dismiss was heard by Patricia M. Dunbar, J., and a hearing
on jurisdiction was had before Carol A. Shaw, J.
      An application for leave to prosecute an
interlocutory appeal was allowed in the Appeals Court by Vickie L. Henry,
J.  The Supreme Judicial Court on its own
initiative transferred the case from the Appeals Court.
      Sherrie Krasner for the child.
      Nathan Bench for the mother.
      Dana Chenevert for the father.
      Julie A. Gallup for Department of Children
and Families.
      Andrew L. Cohen & Ann Balmelli
O'Connor, Committee for Public Counsel Services, for children and family law
division of the Committee for Public Counsel Services, amicus curiae, submitted
a brief.
      WENDLANDT, J.  This case presents the question whether the
Juvenile Court had jurisdiction under the Massachusetts Child Custody
Jurisdiction Act, G. L. c. 209B (MCCJA), over a child born in
Connecticut to parents who live in Connecticut. 
In the circumstances of this case, we concluded that it did not.  Accordingly, we issued a decision on May 8,
2025, and a rescript order on June 5, 2025, remanding this matter to the
Juvenile Court for entry of a judgment dismissing this care and protection case
for lack of jurisdiction.  This opinion
states the reasons for our conclusion.[2]
      1. 
Background.  a.  Facts. 
Faraj (child), the child in this matter, was born in July 2024, in a
Connecticut hospital.  Six months
earlier, the child's mother (mother), who had resided in Massachusetts, began
living in the Connecticut home of the mother of the child's father (father) on
a part-time basis.  That same month, the
Massachusetts Department of Children and Families (department) learned that the
mother was pregnant.  The department had
a lengthy history with the mother; over the course of more than twenty-two
years, the department had removed each of the mother's seven other children
from her custody after, inter alia, the children were exposed to domestic violence
against the mother by her previous partners.[3]
      Months before the child's birth, the
mother enrolled in a Connecticut healthcare program that required proof of
residency in Connecticut.  Until
mid-March 2024, the mother worked in Brookfield, Massachusetts; she testified
that she split her time between her Brookfield apartment and Connecticut.
      On March 18, 2024, the mother reported an
incident of domestic violence involving the father to the Brookfield police
department.  She told officers that,
while arguing about their unborn child, the father threatened her with a
kitchen knife, choked her, and threatened to decapitate her and the child with
a machete.  When the mother attempted to
leave their apartment, the father punched her face and stomach, threw her onto
the bed with such force that the bedframe broke, threatened her again, and took
away her cell phone.  The mother walked
to the police station to report the incident and was granted an emergency restraining
order; responding officers observed a machete among the father's possessions
when they attempted to arrest him that evening. 
The mother recanted her allegations and allowed the restraining order to
lapse.  In view of this incident with the
father and the mother's history with the department, it appeared to the
department that the child was likely to experience harmful exposure to domestic
violence once born.
      In April 2024, approximately three months
before the child's birth, the mother moved into a domestic violence shelter in Connecticut.  She informed the department that she had
relocated permanently to Connecticut; the mother's decision was motivated, in
part, by her belief that the department would be unable to remove the child
from her if she lived outside Massachusetts. 
In turn, the department, aware that the mother had received prenatal
care at a Connecticut hospital, asked the hospital to notify the department
when the child was born.
      The Connecticut hospital complied and, on
the day before the child's birth in July 2024, informed the department that the
mother had been admitted and that labor was scheduled to be induced.  The department called the Connecticut
Department of Children and Families (Connecticut department) public tipline and
told the worker who answered that the department intended to take emergency
custody of the child upon his birth.
      The following day, the child was born, and
the Connecticut hospital informed the department.  Department social workers went to the
Connecticut hospital where the parents and the child were together and took
emergency custody of the child.  The
parents thereafter left the hospital.
      b. 
Procedural history.  Two days
after the child's birth in Connecticut, the department filed a care and
protection petition in the Juvenile Court, seeking temporary custody of the
child.  A Juvenile Court judge (first
judge) granted the department temporary custody the same day.  No representative of Connecticut was at the
hearing, and the first judge made no determination as to the basis for
jurisdiction in Massachusetts.
      At a hearing before a different Juvenile
Court judge (second judge) on August 12, 2024, the mother moved to dismiss the
petition, contending that the Juvenile Court lacked jurisdiction.  Following several days of hearings, the
second judge determined that the Juvenile Court had default jurisdiction
pursuant to G. L. c. 209B, § 2 (a) (2), discussed
infra.  The second judge notified the
parties that she would "coordinate a hearing with Connecticut."  See G. L. c. 209B,
§ 7 (a), (c).
      Following orders from the single justice
of the Appeals Court, the first judge (to whom the matter had been reassigned),
held another hearing on the jurisdictional question.  The first judge then sent a letter requesting
a joint conference to resolve the jurisdictional issues to a judge of the
Connecticut Superior Court for Juvenile Matters (Connecticut judge).  The first judge and the Connecticut judge
held two joint conferences in March 2025.
      In declining to exercise jurisdiction,
the Connecticut judge indicated that Connecticut would revisit its position
should the Massachusetts case be dismissed. 
In a letter memorializing her decision, the Connecticut judge stated
that Connecticut would be an inconvenient forum for the matter because, inter
alia, the department had already initiated a care and protection case and
possessed records and familiarity with the parents that the Connecticut
department did not have.  The Connecticut
judge summarized:  "Essentially,
this case would have to start from scratch in Connecticut whereas proceedings
have been ongoing in Massachusetts for over seven months now . . .
."
      Thereafter, the first judge concluded that
the Juvenile Court had "appropriate forum" jurisdiction under
G. L. c. 209B, § 2 (a) (4), discussed infra; the judge
determined that the child did not have a "home state" as defined in
the MCCJA because the child's eighteen hours with the parents in the hospital's
"labor and delivery floor . . . [was] not sufficient to establish
Connecticut as the [c]hild's home state." 
The judge further found that "neither [m]other nor [f]ather had
established a residence in Connecticut, though [m]other had a place to stay [in
Connecticut]," and that Connecticut had declined jurisdiction.
      The single justice of the Appeals Court
allowed the parents' and the child's joint motion to permit interlocutory
appeal of the jurisdictional question. 
We transferred the case to this court on our own motion.
      2. 
Discussion.  a.  Standard of review.  "Jurisdictional questions are questions
of law, which we review de novo." 
Bask, Inc. v. Municipal Council of Taunton, 490 Mass. 312, 316 (2022).  We likewise "review questions of
statutory interpretation de novo." 
Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 331 (2021).  "The general and familiar rule is that a
statute must be interpreted according to the intent of the Legislature
ascertained from all its words construed by the ordinary and approved usage of
the language, considered in connection with the cause of its enactment, the
mischief or imperfection to be remedied and the main object to be accomplished,
to the end that the purpose of its framers may be effectuated."  Id., quoting Commissioner of Revenue v.
Dupee, 423 Mass. 617, 620 (1996).
      b. 
Child custody statutory framework. 
"In Massachusetts, jurisdiction over child custody proceedings
possibly involving the jurisdictional claims of other States is determined
according to" the MCCJA.  Custody of
Brandon, 407 Mass. 1, 5 (1990), citing G. L. c. 209B.  Under the MCCJA, "a court must determine
whether it has the power to exercise jurisdiction in a custody proceeding and,
if so, whether it should exercise that power under the standards provided in
the" act.  Id.
      Enacted in 1983, the MCCJA is a version of
the Uniform Child Custody Jurisdiction Act and is intended to "encourage
cooperation and avoidance of jurisdictional conflict between courts of
different States in order to protect a child's welfare when litigating custody
matters."  Custody of Victoria, 473
Mass. 64, 68 (2015), citing St. 1983, c. 680, § 2 (a).  See Custody of Victoria, supra, quoting
Thompson v. Thompson, 484 U.S. 174, 180-181 (1988) (discussing prior regime
where State courts often failed to give full faith and credit to custodial
decisions of other States, leading to "national epidemic of parental
kidnapping" and jurisdictional deadlocks). 
To that end, the MCCJA permits a Massachusetts judge to "communicate
and exchange information with a court or courts of any other relevant
jurisdiction."  G. L.
c. 209B, § 7 (c).
      Pertinent here, a Massachusetts court has
jurisdiction to make a child custody determination "only if one of the
following four requirements [is] met," Custody of Victoria, 473 Mass. at
68:
"(1) the
commonwealth (i) is the home state of the child on the commencement of the
custody proceeding, . . . ; or
"(2) it
appears that no other state would have jurisdiction under paragraph (1) and it
is in the best interest of the child that a court of the commonwealth assume
jurisdiction because (i) the child and his or her parents . . . have
a significant connection with the commonwealth, and (ii) there is available in
the commonwealth substantial evidence concerning the child's present or future
care, protection, training, and personal relationships; or
"(3) the
child is physically present in the commonwealth and (i) the child has been
abandoned or (ii) it is necessary in an emergency to protect the child from
abuse or neglect or for other good cause shown . . . ; or
"(4) (i) it
appears that no other state would have jurisdiction under prerequisites
substantially in accordance with paragraph (1), (2) or (3), or another state
has declined to exercise jurisdiction on the ground that the commonwealth is
the more appropriate forum to determine the custody of the child, and (ii) it
is in the best interest of the child that a court of the commonwealth assume
jurisdiction."
G. L.
c. 209B, § 2 (a) (1)-(4).[4] 
Under the MCCJA, a child's "home state" is
"the state
in which the child immediately preceding the date of commencement of the
custody proceeding resided with his parents, a parent, or a person acting as
parent, for at least [six] consecutive months, and in the case of a child less than
[six] months old the state in which the child lived from birth with any of the
persons mentioned.  Periods of temporary
absence of any of the named persons are counted as part of the [six]-month or
other period."  (Emphasis added.)
G. L.
c. 209B, § 1.  "Viewed
broadly, the . . . act grants jurisdiction where Massachusetts is the
child's 'home [S]tate,' but also allows a Massachusetts court to exercise
jurisdiction when, in the Legislature's judgment, it may be appropriate to do
so in the best interests of the child even though [Massachusetts] is not the
child's home State."  Custody of
Victoria, supra, at 69-70.
      With this framework in mind, we turn to
determining whether the Juvenile Court had jurisdiction as to the child in the
present matter.
      i. 
"Home state" jurisdiction. 
A Massachusetts court has jurisdiction under G. L. c. 209B,
§ 2 (a) (1), where the Commonwealth is the child's "home
state."  The department does not
contend that Massachusetts is the child's "home state," as defined by
the MCCJA; the child, who was less than six months old at the time the care and
protection proceeding commenced, was born in Connecticut and never lived in
Massachusetts with a parent.  See
G. L. c. 209B, § 1 (defining "home state" for child
less than six months old as State where child lived from birth with
parent).  To the contrary, as set forth
infra, the only State where the child lived from birth with a parent was
Connecticut.
      ii. 
Default jurisdiction.  Default
jurisdiction, as set forth in G. L. c. 209B, § 2 (a) (2),
grants jurisdiction to a Massachusetts court where (1) it appears that a child
has no "home state" and (2) the child's best interest is served by
having a Massachusetts court determine the child's custody.[5]  G. L. c. 209B, § 2
(a) (2).
      Relying on decisions from our sister
jurisdictions construing similar language in their respective jurisdictional
statutes regarding child custody, the department contends that the child has no
"home state" because his brief hospital stay incident to birth does
not alone constitute "living with" a parent for purposes of
conferring "home state" jurisdiction. 
See In re R.L., 4 Cal. App. 5th 125, 139 (2016); In re D.S., 217 Ill. 2d
306, 317 (2005).  In the department's
view, a child has no "home state" under the MCCJA if a custody
proceeding is commenced immediately after the child's birth while the child is
still in the hospital.  The department
misapprehends the rationale of the cases upon which it relies.
      In In re D.S., 217 Ill. 2d at 309, the
mother fled Illinois and was bound for Tennessee when she unexpectedly went
into labor and gave birth in Indiana. 
The Illinois Supreme Court rejected the mother's contention that Indiana
was the child's "home state" under the Illinois version of the
uniform child custody act because she and the child had "lived" in
the Indiana hospital temporarily following the child's birth.  Id. at 317. 
The Illinois court reasoned that the mother 
"had no
connection to Indiana and no intention of remaining there following D.S.'s
birth.  On the contrary, respondent
testified that she is a longtime resident of Illinois who, fearful of losing
custody of D.S., intended to move to Tennessee. 
En route, she entered active labor and checked herself into the nearest hospital,
which happened to be in Crawfordsville, Indiana.  By itself, this temporary hospital stay in
Indiana is simply insufficient to confer 'home state' jurisdiction upon that
state."

Id. at
318-319.  See In re R.L., 4 Cal. App. 5th
at 132-133, 139 (California was not child's "home state," where
mother split time between Nevada and Mexico, father lived in Mexico, and only
tie to California was that mother had "entered California . . .
to give birth to R.L." with hope of eventually settling in California); In
re R.P., 966 S.W.2d 292, 300-301 (Mo. Ct. App. 1998) (child's "home
state" was not Kansas, where mother lived in Missouri, received healthcare
benefits from Missouri Medicaid, and intended to return to Missouri after
child's birth, and sole connection with Kansas was that mother went there to
give birth).  Cf. Ocegueda v. Perreira,
232 Cal. App. 4th 1079, 1082, 1094-1095 (2015) (where mother who lived and
worked in California traveled to Hawaii to give birth and then lived with child
in Hawaii for almost six weeks, Hawaii, not California, was child's "home
state").
      To the extent the department's argument is
that a parent's intent to live in a particular State without more does not end
the "home state" inquiry, we agree; a parent cannot "intend her
way out of an actual living situation -- that is, she cannot confer home state
jurisdiction on a state where she does not actually live by declaring an
intention to begin living there prospectively."[6]  In re M.S., 2017 VT 80, ¶ 48 (Robinson, J.,
concurring).  However, this does not mean
that, in determining the "home state" of a child less than six months
old, the child's physical presence in a State at birth and the parents'
"living situation and intentions at the time of the child's birth"
are irrelevant.  Id.  When a parent lives in a single State, does
not intend to relocate at the time of the child's birth, and plans to return to
the parent's home in that State with the child upon discharge from the
hospital, the parent and child live together in that State from the moment the
child is born, whether or not they are still in the hospital.  See id.
      Here, unlike the cases upon which the
department relies, the mother and the father had not merely declared an intent
to live in Connecticut; nor were they simply passing through Connecticut on a
journey elsewhere at the time the mother gave birth to the child.  To the contrary, the mother reported before
the child's birth that she relocated permanently to Connecticut, had attended
prenatal visits in Connecticut, and was enrolled in a Connecticut healthcare
plan.  The father had lived in
Connecticut for years and was living there at the time of the child's birth.[7]  The child was born in a Connecticut hospital
and, but for the department's intervention,[8] the child would have returned
with the mother to her Connecticut home upon discharge from the hospital.[9]  Although the mother had substantial
connections to Massachusetts, there was nothing in the record to suggest that,
at the time the department filed the petition in the Juvenile Court, either
parent planned to leave Connecticut or that it was a mere "pit stop"
on their way to another State.[10]
      In these circumstances, Connecticut was
the child's "home state" and, accordingly, the Juvenile Court lacked
default jurisdiction under G. L. c. 209B, § 2 (a) (2).
      iii. 
Emergency jurisdiction.  Pursuant
to G. L. c. 209B, § 2 (a) (3), a Massachusetts court has
emergency jurisdiction when a child is "physically present" in
Massachusetts and either "has been abandoned" or "an
emergency" requires intervention to, inter alia, "protect the child
from abuse or neglect."  Because the
child was physically present in Connecticut at the time the department
commenced the care and protection proceedings, the department correctly does
not maintain that the Juvenile Court had emergency jurisdiction.
      iv. 
Appropriate forum jurisdiction. 
Finally, G. L. c. 209B, § 2 (a) (4), confers
appropriate forum jurisdiction to a Massachusetts court where (1) either no
State appears to have "home state," default, or emergency
jurisdiction or another State with such jurisdiction has declined to exercise
it, and (2) the child's best interest is served by having a Massachusetts court
determine the child's custody.
      As discussed supra, the child's "home
state" is Connecticut.  Thus, under
G. L. c. 209B, § 2 (a) (4), the Juvenile Court was
empowered only to exercise appropriate forum jurisdiction after Connecticut
"declined to exercise [its 'home state'] jurisdiction on the ground that
the [C]ommonwealth is the more appropriate forum to determine the custody of
the child."  G. L.
c. 209B, § 2 (a) (4) (i). 
Here, at the time the Juvenile Court exercised jurisdiction and issued
custody orders, Connecticut had not declined jurisdiction.  The Juvenile Court did not have the power to
issue custody decisions before Connecticut declined to do so.  Compare Adoption of Anisha, 89 Mass. App. Ct.
822, 827 (2016) (Juvenile Court judge "acted well within his statutory and
inherent authority" in waiting to make custody decisions until after
Tennessee court declined jurisdiction; "[m]ost importantly, no custody
decisions were made until jurisdiction in Massachusetts was established").
      And, while Connecticut eventually declined
jurisdiction, its decision was influenced by the Juvenile Court judges' prior
custody orders, which neither judge had the authority to make.  In these circumstances, the Juvenile Court
did not have appropriate forum jurisdiction.
      3. 
Conclusion.  For the foregoing
reasons, the Juvenile Court did not have jurisdiction to make custody
determinations for the child.  See, e.g.,
Everett v. 357 Corp., 453 Mass. 585, 612 (2009) (it is "a fundamental
tenet of law" that lack of jurisdiction is fatal to claims); ROPT Ltd.
Partnership v. Katin, 431 Mass. 601, 605 (2000) (where court lacks
jurisdiction, "the judgment is void").  Accordingly, we issued a decision on May 8,
2025, and a rescript order on June 5, 2025, remanding this matter to the
Juvenile Court for entry of a judgment dismissing this care and protection case
for lack of jurisdiction.  

footnotes
[1] A pseudonym.

[2] We
acknowledge the amicus curiae letter submitted by the children and family law
division of the Committee for Public Counsel Services.

[3] The mother
also had a history of alcohol use disorder, and the absence of a sober
caretaker contributed to care and protection actions concerning three of the
mother's other children.

[4] Contrary to
the position of the child and the parents, G. L. c. 119, § 1,
which sets forth the Commonwealth's "policy" for the protection of
children "of the [C]ommonwealth," does not govern the Juvenile
Court's jurisdiction over custody matters where, as here, more than one State
may have an interest in the child's care. 
See Redding v. Redding, 398 Mass. 102, 106 (1986) ("The decision of
a Massachusetts court to exercise jurisdiction and to make a custody
determination must be based solely on G. L. c. 209B").  "Physical presence of the child [in the
Commonwealth], while desirable, is not a prerequisite . . . to make a
custody determination."  G. L.
c. 209B, § 2 (c).  See G. L.
c. 209B, § 2 (b) ("physical presence in the [C]ommonwealth of
the child . . . is not alone sufficient to confer
jurisdiction").

[5] "[I]n
contrast to the definition of 'best interest of the child' generally applied in
child custody litigation, the phrase as used in this context elevates the value
of the child's connections to the Commonwealth in the jurisdiction
calculus."  Custody of Victoria, 473
Mass. at 71.  Specifically, the best
interest of the child standard under the MCCJA is met if (1) "the child
and his or her parents" "have a significant connection with the
[C]ommonwealth," and (2) "substantial evidence concerning the child's
present or future care, protection, training, and personal relationships"
must be "available in the [C]ommonwealth."  Id. at 69, quoting G. L. c. 209B,
§ 2 (a) (2).  Because the
child's "home state" is Connecticut, we need not reach the
department's arguments regarding these additional conditions.

[6] See generally
In re the Marriage of Miller & Sumpter, 196 S.W.3d 683, 685, 691–692 (Mo.
Ct. App. 2006), abrogated on other grounds by Hightower v. Myers, 304 S.W.3d
727, 733 (Mo. 2010) (en banc) (where children lived in Virginia for well over
six months preceding initiation of custody proceeding, Virginia was their
"home state" notwithstanding fact that mother, who was in military,
listed Missouri as her permanent residence, and intended to retire in
Missouri); Powell v. Stover, 165 S.W.3d 322, 323-324, 326-328 (Tex. 2005)
(where mother and father moved from Texas to Tennessee with child for period of
ten months, and then mother returned to Texas with child and initiated custody
action, mother's asserted subjective intent to return to Texas during ten-month
period did not make Texas child's "home state" because child had
actually lived in Tennessee for preceding ten months).

[7] As set forth
supra, the first judge found that "neither [m]other nor [f]ather had
established a residence in Connecticut, though [m]other had a place to stay [in
Connecticut]."  To the extent this
finding suggests that the mother and the father were not living in Connecticut
at the time of the child's birth, it is not supported by the record before the
first judge.  See Custody of Eleanor, 414
Mass. 795, 799 (1993) ("A finding is clearly erroneous when there is no
evidence to support it, or when, 'although there is evidence to support it, the
reviewing court on the entire evidence is left with the definite and firm
conviction that a mistake has been committed'" [citation omitted]).  Although the record shows that the mother
split her time between Connecticut and Massachusetts between January and March
2024, the evidence that the mother was living in Connecticut from at least
April 2024, including her enrollment in Connecticut health insurance and
residence in a Connecticut domestic violence shelter, was uncontested.  The evidence that the father lived in
Connecticut throughout this period likewise was uncontested.

[8] We do not
suggest that the department's concerns regarding the child's well-being were
unfounded.  To the contrary, as set forth
supra, the mother's lengthy history of domestic violence, the department's
experience with her other seven children, and the March 2024 report regarding
the father's assault against the mother all gave rise to the department's
concerns for the child.  Of course,
nothing prevented (or currently prevents) the department from coordinating with
the Connecticut department in an effort to protect the child.  See G. L. c. 119, § 51E
("A child welfare agency of another state may, upon request, and upon the
approval of the commissioner, receive a copy of the written report of the
initial investigation if the agency has a need for such information in order to
carry out its responsibilities under law to protect children from abuse and
neglect").

[9] For at least
this reason, the department's reliance on the unpublished Appeals Court case
Adoption of Rafael, 99 Mass. App. Ct. 1113 (2021), is misplaced.  See id. (mother was Massachusetts resident
who traveled to Rhode Island to give birth).

[10] In concluding
that the child did not have a "home state" under the MCCJA, the first
judge apparently relied on the finding that the "[m]other's attempt to
relocate to Connecticut was motivated, at least in part, by her belief that if
the [c]hild was born in Connecticut, [the department] would not be able to
remove the [c]hild from her care." 
As previously explained, the mother did not merely attempt to relocate
to Connecticut, but actually did so; for months prior to the child's birth, the
mother lived in Connecticut.  See note 7,
supra.  The mother's reason for doing so,
while lamentable, is only relevant to the MCCJA analysis to the extent it
illuminates the permanence of the mother's and child's presence in a particular
State.  See In re M.S., 2017 VT 80, ¶¶
45-46 (Robinson, J., concurring).