NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

23-P-664                                           Appeals Court

ADOPTION OF TWYLA.[1]

No. 23-P-664.

Berkshire.      March 6, 2024. - July 15, 2024.

Present:  Milkey, Sacks, & Smyth, JJ.


Massachusetts Child Custody Jurisdiction Act.  Jurisdiction,
    Care and protection of minor, Juvenile Court.  Minor, Care
    and protection.  Adoption, Care and protection, Dispensing
    with parent's consent.  Parent and Child, Care and
    protection of minor, Dispensing with parent's consent to
    adoption.  Juvenile Court, Jurisdiction.  Practice, Civil,
    Care and protection proceeding, Adoption.



    Petition filed in the Berkshire County Division of the
Juvenile Court Department on November 20, 2018.

    The case was heard by Joan M. McMenemy, J.

    Laura M. Chrismer for the mother.
    William Cuttle for Department of Children and Families.
    Laura Smith for the child.


    MILKEY, J.  This is a care and protection action involving

Twyla, a girl born in upstate New York in 2017.  Her parents --

_____

    [1] A pseudonym.

who were not married -- moved with great frequency.  As of November 2018, they were living in separate homeless shelters in Queens, New York.  That month, the father traveled to Massachusetts with Twyla to visit a friend.  Following what a Juvenile Court judge termed "a series of unfortunate events," the Department of Children and Families (department) initiated a care and protection proceeding and obtained temporary custody of Twyla.

It is undisputed that Twyla had no substantial ties to Massachusetts and that New York was her "home State." Nevertheless, various efforts to shift the matter to New York foundered, and the Massachusetts care and protection action proceeded.  After trial, the judge issued decrees that found Twyla in need of care and protection, found both parents unfit, terminated their parental rights, awarded permanent custody of Twyla to the department, and approved a plan that Twyla be adopted by her foster mother, who lived in Connecticut.  Both parents appealed.  Twyla also appealed, although she subsequently realigned with the department as an appellee.

The father died while his appeal was pending.  This prompted the mother to file a motion for relief from judgment pursuant to Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974), arguing that because many of the judge's concerns about parental fitness involved the father, his death constituted a change in

circumstances that warranted reopening the proceedings. The trial judge denied the motion. On appeal, the mother challenges both the underlying decree that terminated her rights and the order denying her rule 60 (b) motion. More fundamentally, she contends that the judge lacked subject matter jurisdiction to issue permanent custody orders, because New York never declined its jurisdiction. We agree.

Background. 1. Twyla's removal. Despite her transient lifestyle, the mother presented as a "hard worker [who is] consistently employed." The father served as the primary caretaker of Twyla, and in the fall of 2018, he lived with her in a homeless shelter in Queens. The mother "lived nearby in a different shelter, and saw the child frequently."

Just before Thanksgiving of 2018, the father traveled to Pittsfield with Twyla to "be with" a female friend of his. Twyla was then thirteen months old. According to the judge, the mother told a department social worker that the father did not leave Twyla "with her, because she was too stressed as she was dealing with custody issues as to her two older children." Whether the father had planned this as a temporary trip or an indefinite move was contested at trial. The judge ultimately found, based on "the totality of the evidence, [that the f]ather had left New York with the child with plans to stay in Massachusetts indefinitely."

In any event, after the woman whom the father had come to see did not allow him to stay, the father needed a place to spend the night. At a local Dollar Store, he met someone willing to give him and Twyla a place to stay. That plan was disrupted, however, when a store employee who had overheard the father's conversation with the other customer became concerned for Twyla's welfare and contacted the police. The police in turn discovered that the father had an outstanding, decade-old arrest warrant for shoplifting. Because the police arrested the father, and the mother could not come to Pittsfield, Twyla was in need of a caretaker for the night, and the department took emergency custody of her. Although the father cleared the warrant the following day, the department refused to return Twyla to him. He returned to New York City to stay in a homeless shelter in Queens, where the mother subsequently joined him.

The mother filed a motion to dismiss the pending care and protection case. She argued that the immediate crisis that may have necessitated the department's intervention was over, that the department had no evidence that she or the father was abusing or neglecting Twyla, and that the department immediately should return Twyla to the father. The department opposed the motion and raised concerns about the father's criminal record and apparent history of substance misuse. The judge denied the

mother's motion, satisfied that there were sufficient care and protection concerns to move forward.  She awarded temporary custody to the department, which placed Twyla in foster care.

2.  <u>The jurisdictional problem</u>.  From the start, there was a patent potential jurisdictional infirmity.  Twyla had no appreciable ties to Massachusetts and -- as all parties agree -- New York unquestionably was her "home State" for purposes of the Massachusetts Child Custody Jurisdiction Act (MCCJA), G. L. c. 209B.  As a result, although the Massachusetts judge had jurisdiction to issue an emergency order to solve the immediate crisis, see G. L. c. 209B, § 2 (a) (3), her authority to issue permanent custody orders lay in significant doubt.  The father raised these jurisdictional issues in his own motion to dismiss that he filed in December of 2018.

The judge herself recognized that there were no significant ties between the family and Massachusetts and that Massachusetts "would be a terribly inconvenient forum for the parents." Accordingly, she expressed her willingness to have the care and protection concerns addressed in a New York forum.  The challenge presented, however, was that there was no care and protection action pending in New York, nor even an open administrative matter.  Complicating the matter further was the fact that because the parents moved within New York State so often, which county presented proper venue was not at all clear.

Indeed, at least four different New York counties were implicated.[2]

Stressing that "[w]hether or not protective services are required can be addressed by the appropriate authorities in New York," and seeking to move the process along, the mother's counsel by letter provided the department and the judge relevant contact information for the State and municipal agencies and courts in the various New York counties potentially implicated. The mother's counsel also pointed out to the judge that there was one custody-related action then pending in a New York State court. That was not a care and protection action, but a private action that the father had filed against the mother in Schenectady County Family Court. The complaint in that case is not in the record, and we know little about the nature of the action or even when it was filed.[3] Nor do we know why the father

---

[2] Twyla was born in Amsterdam, New York, which is in Montgomery County. Thereafter, the family moved to Schenectady, which is in Schenectady County, although the father also had extended stays in Albany, which is in Albany County. They then moved to Queens, which is in Queens County, and after that to Brooklyn, which is in Kings County. Subsequently, they moved back to Amsterdam.

[3] The department has represented that this action was filed after the Massachusetts care and protection action, and the trial judge so found. However, the mother questions that sequence, and we see nothing in the record to support the department's contention and the judge's finding. We additionally note that the parents already had moved from Schenectady to New York City before the father's trip to

filed it when -- despite the sometimes difficult relationship between him and the mother -- the couple otherwise appeared to be in agreement as to the custody of Twyla.  Nevertheless, the existence of that case proved significant because it meant that there was an identified New York judge with whom the Massachusetts judge could communicate, on the record, with respect to custody issues related to Twyla.

3.  The jurisdictional hearing.  With the father having filed his motion to dismiss, the Massachusetts judge held a hearing on the jurisdictional issues on December 21, 2018.  The judge in the pending Schenectady Family Court custody action (Schenectady judge) participated in that hearing telephonically. The Schenectady judge stated that she had doubts whether the father's custody action was properly before her, because it appeared that the parties no longer lived in Schenectady County. She noted that if the parties indeed had moved, she could transfer the father's custody action to the appropriate county. With respect to the care and protection concerns raised in Massachusetts, the Schenectady judge explained that she could not initiate a parallel action in New York; that would have to be done by the relevant New York agency, which was the

---

Massachusetts (the event that triggered the filing of the care and protection action).

Department of Social Services (DSS) for the applicable county.[4] According to the Schenectady judge, the most she could do would be to issue an order pursuant to N.Y. Family Court Act § 1034, requesting the DSS to conduct an investigation into Twyla's welfare. The Schenectady judge expressed a willingness to do that. In the interim, she requested that the Massachusetts judge "hold everything in abeyance until" the initial hearing in the father's case, which was scheduled for January 7, 2019. According to the Schenectady judge, if the parties appeared at that hearing, it could be sorted out how to proceed based on where they were living. The Schenectady judge also pointed out that any investigation into Twyla's welfare would take time, and she requested that the Massachusetts judge "perhaps consider continuing in your process until we can actually determine whether New York State is going to do anything, if at all." The somewhat ambiguous request that the Massachusetts judge

---

[4] Although the New York State agency with oversight of care and protection matters appears to be the New York Office of Children and Family Services, the direct provision of services is done through the DSS in each "district." See N.Y. Exec. Law §§ 500, 501(14); N.Y. Soc. Serv. Law §§ 2, 61, 62, 417(1). With the exception of the five counties that make up New York City, each county comprises its own "district" that has its own DSS. N.Y. Soc. Serv. Law § 61. To further complicate matters, New York City appears to have its own child welfare agency known as the Administration for Children's Services. See N.Y.C. Administrative Code §§ 21-190, 21-901. How such municipal offices relate to any State or "district" counterparts is not immediately clear but unnecessary to resolve in this appeal.

"continu[e] in [her] process" stands in some tension with the Schenectady judge's request in the same conversation to "hold everything in abeyance" for the moment. However, whether the Schenectady judge was suggesting that the Massachusetts judge allow a continuance in the care and protection case, or instead take some steps to move that case along, it is plain that the Schenectady judge did not at that point consider the jurisdictional issues as having been resolved. Rather, the proposed plan was to table any decision on how to proceed until after the scheduled hearing in the Schenectady case. The Massachusetts judge was on board with that plan and indicated her intent to check in with the Schenectady judge after the January 7, 2019 hearing.

Some other aspects of the December 21, 2018 hearing on the jurisdictional issues warrant mention. The attorney for the department noted that her agency already had inquired whether the applicable child welfare office in Brooklyn (Kings County) would initiate an investigation into Twyla's welfare. However, that office reportedly had questioned whether it was the right one to pursue the matter, because Twyla herself never had lived in that county. The department attorney went on to suggest that instead of seeking to have the applicable DSS initiate an administrative investigation, it might be faster to address the care and protection concerns by having Massachusetts and New

York enter into an agreement pursuant to the Interstate Compact for the Protection of Children (ICPC). See generally Adoption of Knox, 102 Mass. App. Ct. 84, 88-93 (2023) (discussing role served by ICPC agreements).

4. Dismissal of the Schenectady case. Notwithstanding what was said at the December 21, 2018 hearing, the two judges did not communicate again for almost five years. However, in March of 2019 -- that is, two months after the initial scheduled hearing in the father's Schenectady County custody action -- the Massachusetts judge learned from the department's counsel that the Schenectady judge had dismissed that action. As the Schenectady judge later explained, she dismissed it for failure to prosecute (the father never having served the mother or appeared at scheduled hearings). At that point, the Massachusetts judge and the parties themselves focused on the merits of the care and protection case and not whether there was a jurisdictional defect. In fact, the judge never ruled on the father's motion to dismiss for want of jurisdiction.

5. Developments in Massachusetts case. During 2019, the department sought an ICPC agreement with New York. That request was denied based on the parents' failure to cooperate. It bears noting that at the time, the parents were residing in a homeless shelter that did not accept children. Despite living in homeless shelters in New York City, the mother found a way to

visit Twyla in Massachusetts and later Connecticut (where Twyla eventually was placed). To the extent the visits were in person, the mother was required to take multiple, long-distance bus trips to attend them.

A best interests trial was scheduled to commence on January 22, 2020. By that date, the parents had obtained a subsidized, three-bedroom apartment in Amsterdam (the city where Twyla had been born), and counsel reported to the judge that they were now living back in upstate New York.[5] This brightened the prospects that they could obtain an ICPC agreement that might lead to reunification. With the judge's encouragement, the parties agreed to put off a termination trial; instead, the parents stipulated that they were currently unfit, but would pursue an ICPC agreement and, if necessary, a private home study. A permanency hearing was rescheduled for October 2, 2020.

---

[5] In her findings, the judge referred to the new apartment, where the mother continued to live until at least 2023, as being in Schenectady or the "Schenectady area." It appears from references in the record that the apartment actually was in Amsterdam, which lies about eighteen miles northwest of Schenectady in a different county. The outcome of this case does not ultimately turn on whether the parents' apartment was in Amsterdam or Schenectady, or whether Amsterdam accurately can be characterized as being in the Schenectady area. In addition, it is understandable that the Massachusetts judge, Massachusetts-assigned counsel, and Massachusetts agency likely lacked ready familiarity with New York geography. Still, the imprecision in the record about where the mother was living is emblematic of the problems in this case.

During the course of the January 22, 2020 hearing, the judge sua sponte made a reference to previous efforts "to sort out the jurisdictional issue." She recalled that she had "looked at this case from the get-go as the case that should have been in New York, given where the parents lived, and given the fact that [Twyla] was only supposed to be here for a short period of time." Nevertheless, the judge treated the jurisdictional issue as having been resolved in favor of Massachusetts retaining jurisdiction, noting her recollection that the Schenectady judge had declined jurisdiction after unsuccessfully trying to get some of her counterparts to take the case. As the department now acknowledges, this is not supported by the record.[6]

In June of 2020, at the department's request, the DSS for Montgomery County again tried to conduct an ICPC home study, but once more reported that it was unable to contact the parents. Three months later, that agency was able to conduct a home study, but denied ICPC approval on the merits. Specifically, a

---

[6] The department suggests that the discontinuity between what the judge remembered and what is on the record indicates that the judge must have had additional communications with the Schenectady judge that were not noted on the record. That suggestion appears at odds with the Schenectady judge's subsequent reconstruction of what occurred. See infra. In addition, we note that New York law requires that conversations between judges with respect to such jurisdictional issues be put on the record. See N.Y. Dom. Rel. Law § 75-i(4).

DSS case supervisor concluded that "[d]ue to [the parents'] past and current criminal history, recent occurrences of [d]omestic [v]iolence, observed drug paraphernalia, and pending drug charges, and lack of cooperation in mental health counseling and substance abuse treatment, [they] d[id] not recommend placement of [Twyla] with [the parents]."

Domestic violence emerged as perhaps the most critical issue related to the parents' fitness, especially after a "well-documented [incident] in June 2020." The police arrested the father after the mother reported that he had strangled her to the point that she became unconscious. The charges later were dropped after the mother apparently declined to cooperate in the prosecution.

The mother had suffered domestic violence at the hands of a previous partner (the father of her older children). The Massachusetts judge found that although the mother had participated in domestic abuse education, she had failed to gain an "understanding of how harmful domestic abuse is to both herself and [Twyla]." The judge identified this and the mother's "mental health struggles" as two of "[t]he main barriers to returning [Twyla] to her care." After the mother moved to the apartment in Amsterdam, she began to engage in the services made available to her, including individual therapy. While the judge characterized this as "encouraging," she found

that the mother later appeared to be "backsliding in her progress."

Meanwhile, the parents' economic stability also declined, especially after the initial subsidy of their Amsterdam apartment ran out. By the end of the best interests trial, the parents ostensibly had broken up and the father had moved out of the apartment, although the judge did not credit that the relationship truly had ended. The mother in any event had depleted her savings and fallen significantly behind in paying the rent. With the unvoiced prospect of eviction in the background, the mother expressed an interest in moving to an apartment in Brooklyn. The judge found this to be "not a realistic plan."

6. <u>Best interests trial</u>. Trial was delayed for many reasons, including substitution of counsel for each parent, health problems experienced by the father, and logistical issues related to the onset of the COVID-19 pandemic. The trial began on November 30, 2021, and continued over four nonconsecutive days, concluding on February 2, 2022. The mother testified; the father did not, and in the end, he essentially abandoned the proceedings (leading the judge to draw negative inferences against him).

At trial, Twyla was aligned with her parents in supporting reunification. The judge nevertheless found both parents unfit

and terminated their parental rights.  The judge explained her reasoning as follows:

> "Given the state of the parents' relationship, the unresolved issues of domestic violence, the housing instability and untenable plan for a move to Brooklyn, and Father's presentation (and abandonment of the proceedings) at trial, it is clear that [Twyla's] best interest would be served by adoption with the current foster mother [with whom she had lived in Connecticut since October of 2020]."

In March of 2022, that is, one month after the trial ended, the judge issued a five-page "Summary, Adjudication, and Orders for Decrees After Trial," and she later supplemented that preliminary order with detailed findings of fact and rulings of law.  In those findings, the judge addressed the jurisdictional issue directly, stating that she had "inquired whether the Schenectady Family Court would assume jurisdiction over [Twyla, and t]he New York Court declined to exercise jurisdiction."

7.  The rule 60 (b) motion.  In March of 2023, one month after the judge issued her findings and rulings, the father died.  This prompted the mother to file her rule 60 (b) motion, arguing that "the father's death presents an extraordinary circumstance that materially changes the circumstances."  In an affidavit submitted in support of the motion, the mother stated that she recently had reconnected with a domestic violence support group, which the entity running that group confirmed. The mother also submitted an affidavit from the father's mother (paternal grandmother), who was offering to be a placement

resource for Twyla. The paternal grandmother stated that she had been estranged from her son and learned that the parents' rights had been terminated only at his funeral.[7]

The judge denied the mother's motion without an evidentiary hearing, concluding that "Father's death is not an 'extraordinary circumstance' that would warrant a reopening of the evidence." According to the judge, an evidentiary hearing was unnecessary to explore the mother's current efforts to address the domestic violence issues, because "[w]hether or not Mother has recently re-engaged in domestic abuse services does not alter the Court's findings as to Mother's lack of insight and resulting unfitness to safely parent [Twyla]." Similarly, the judge stated that "[a]ssuming again that at an evidentiary hearing, [the paternal grandmother] would testify as to her estrangement with her son, her own illness, her willingness to become involved now, this evidence is far from persuasive evidence that Mother would have the kind of support she may need to successfully meet the needs of a child in her care."

8. Further developments. In her appellate briefs, the mother argued that the judge lacked subject matter jurisdiction

---

[7] The paternal grandmother stated that she could not have served as a placement resource in 2018 when Twyla was removed because she was suffering from cancer at the time. According to her, she has "now been in remission for almost [five] years [and] . . . was available and willing to be a resource for [Twyla], should that be needed."

to issue the decrees, because New York never had declined jurisdiction. For their part, the department and Twyla briefed the jurisdictional issues as straightforward. Consistent with what the judge had said in her findings, they argued that the judge had invited the Schenectady judge to take over the matter and that the Schenectady judge had declined to do so.

As the original oral argument date approached, however, it appears that the department and Twyla realized -- accurately -- that the jurisdictional issues perhaps were not as straightforward as they might first appear. In November of 2023, the department and Twyla together filed a motion seeking permission to ask the judge to communicate with the Schenectady judge in order to clarify whether New York had declined jurisdiction. At that point, the two judges had not communicated since the jurisdictional conference in December of 2018. The motion made it clear that they were seeking to have the Schenectady judge confirm that she had declined jurisdiction as of a particular date, and that, if so, they were going to request the Massachusetts judge to declare that Massachusetts had jurisdiction as of that date nunc pro tunc. After the mother opposed the motion, a different panel of this court allowed it, and oral argument was postponed.

The department proceeded to file the contemplated motion in Juvenile Court. This prompted the judge to send a written

inquiry to the Schenectady judge.  Specifically, after laying out the relevant background in detail, the judge asked the Schenectady judge "whether you wish to assert or decline jurisdiction, nunc pro tunc, to December 21, 2018 [the date of the jurisdictional conference in which the New York judge participated]."  The Schenectady judge responded by letter dated November 27, 2023, without directly answering the specific question asked.  Instead, she summarized the action she had taken in 2019 in the father's custody action as follows:  "The single custody petition filed by the father in this Court was never served on the mother.  As such, this Court never obtained personal jurisdiction over her.  Further the father failed to appear at subsequent Court appearances and his petition was dismissed."  She explained:  "Thus, interstate jurisdiction was never addressed due to [the father's] failure to prosecute."  The Schenectady judge then apologized for her unresponsiveness to the question that the Massachusetts judge had posed to her:  "Unfortunately, I cannot go back in time to consider an issue which was never ripe before this Court.  I am sorry I was unable to give more assistance."

In response to the November 27, 2023 letter, the Massachusetts judge "directed [the] Clerk Magistrate to contact [the Schenectady judge's] Clerk Magistrate to see whether we could set up an on the record hearing with [the Schenectady

judge], and counsel for all parties here in Massachusetts, to further clarify whether the letter of November 27, 2003, was a clear declination of jurisdiction."  This prompted a follow-up letter from the Schenectady judge.  In that letter, dated December 12, 2023, she reiterated the action she had taken to dismiss the father's custody petition.  Then, in a one-sentence paragraph she added:  "Thereafter, I declined to exercise jurisdiction over this matter."  No further explanation was provided.

On December 20, 2023, the Massachusetts judge issued "Further Findings of Fact on the Issue of Jurisdiction." Characterizing the Schenectady judge's two 2023 letters as "declining to exercise jurisdiction over [Twyla]," the judge found that in light of those letters, the December 2018 hearing, and the Schenectady judge's dismissal of the father's custody case, "a court of competent jurisdiction in New York has expressed a continued and more clear declination of jurisdiction."  She further found that her exercising jurisdiction was in Twyla's best interests.

After oral argument, we requested supplemental briefing on the jurisdictional issues.  Collectively, the parties submitted eighty-seven additional pages of briefing on these issues.

Discussion.  1.  Overall jurisdictional framework.  Whether the judge had jurisdiction to issue a permanent custody ruling

is governed by the MCCJA, G. L. c. 209B.  See MacDougall v. Acres, 427 Mass. 363, 366 (1998).  See also Guardianship of Zeke, 422 Mass. 438, 441 (1996), quoting Redding v. Redding, 398 Mass. 102, 106 (1986) ("The decision of a Massachusetts court to exercise jurisdiction and to make a custody determination must be based solely on G. L. c. 209B").  If the judge did not have jurisdiction pursuant to the MCCJA, this is considered a defect in subject matter jurisdiction that can be raised at any time. See MacDougall, supra at 371.

The MCCJA provides four different species of jurisdiction, each set forth in a separate subsection of G. L. c. 209B, § 2 (a).  Because New York unquestionably was, and had always been, Twyla's home State, Massachusetts courts did not have "home state jurisdiction" pursuant to G. L. c. 209B, § 2 (a) (1).  Similarly, Massachusetts courts could not have "default jurisdiction" pursuant to G. L. c. 209B, § 2 (a) (2), which applies only where "no other state would have [home state] jurisdiction."  See MacDougall, 427 Mass. at 368.

Because Twyla was physically present in Massachusetts when the father's arrest necessitated the department's intervention, the judge plainly had "emergency jurisdiction" to order temporary relief pursuant to G. L. c. 209B, § 2 (a) (3). However, by the express terms of that subsection, the judge's authority is limited to issuing temporary orders "unless the

court of the other state has declined to exercise jurisdiction, has stayed its proceedings or has otherwise deferred to the jurisdiction of a court of the commonwealth."  The principal dispute before us is whether that precondition to the judge's power to issue permanent custody orders based on emergency jurisdiction has been met.

Before turning to that issue, however, we first address whether the judge could have had "appropriate forum jurisdiction" pursuant to the remaining subsection, G. L. c. 209B, § 2 (a) (4).  That subsection applies when (i) there is no other State with jurisdiction, or "another state has declined to exercise jurisdiction on the ground that the commonwealth is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that a court of the commonwealth assume jurisdiction."  Id.  Neither precondition to appropriate forum jurisdiction has been met here.  First, while it can be debated whether New York "declined jurisdiction" -- see discussion infra -- it cannot reasonably be maintained that any such declination was "on the ground that the commonwealth is the more appropriate forum."

Second, although the judge purported to find that it was in Twyla's "best interest" that Massachusetts assert jurisdiction to resolve the permanent custody issues, that finding is at odds with the special meaning of that term that applies in this

context. "Because G. L. c. 209B, § 2 (a) (4), does not separately define 'the best interest of the child,' we apply the factors set forth in the definition of that phrase in G. L. c. 209B, § 2 (a) (2)." Adoption of Anisha, 89 Mass. App. Ct. 822, 830 (2016) (Kafker, C.J.), quoting Redding v. Redding 398 Mass. 102, 106 (1986). It follows that in this context, the best interest requirement means that "(i) the child and his or her parents, or the child and at least one contestant, have a significant connection with the commonwealth, and (ii) there is available in the commonwealth substantial evidence concerning the child's present or future care, protection, training, and personal relationships." Adoption of Anisha, supra at 829, quoting G. L. c. 209B, § 2 (a) (2). See Custody of Victoria, 473 Mass. 64, 71 (2015) ("in contrast to the definition of 'best interest of the child' generally applied in child custody litigation, the phrase as used in this context elevates the value of the child's connections to the Commonwealth in the jurisdiction calculus"). Even putting aside that New York was the locus of almost all the evidence regarding whether the parents were fit to serve Twyla's needs with or without public supports, Twyla had no "significant connection with the commonwealth." Therefore, the best interest prerequisite to "appropriate forum jurisdiction" simply could not be satisfied here. No one -- least of all the judge -- ever maintained that

a Massachusetts court was the more appropriate forum to have the permanent custody issues resolved.

2. _What it means to decline jurisdiction_.  It follows then that the only potential source of jurisdiction that the judge had was emergency jurisdiction pursuant to G. L. c. 209B, § 2 (_a_) (3).  Under the express terms of that subsection, whether this allowed the judge to resolve the permanent custody of Twyla in turn hinged on whether "the court of the other state ha[d] declined to exercise jurisdiction, ha[d] stayed its proceedings or ha[d] otherwise deferred to the jurisdiction of a court of the commonwealth."  Short of this, "it was not permissible for the Juvenile Court to proceed unilaterally and indefinitely with the care and protection case."  _Adoption of Yvette (No. 1)_, 71 Mass. App. Ct. 327, 342 (2008).  "A temporary order was all that the Juvenile Court had authority to enter, unless [the home state] expressly declined jurisdiction."  _Id_. at 343, citing _Orchard_ v. _Orchard_, 43 Mass. App. Ct. 775, 780 (1997).[8]

_____

[8] _Adoption of Yvette (No. 1)_, 71 Mass. App. Ct. at 328, involved dueling custody cases in Maryland, the child's home State, and Massachusetts.  We held that the Juvenile Court judge erred by proceeding with the care and protection action based only on emergency jurisdiction, but that this jurisdictional defect ultimately was cured by the Maryland judge's dismissing the parallel Maryland action, which -- under the circumstances -- amounted to an express "declination of jurisdiction in favor of Massachusetts."  _Id_. at 346.  Because we concluded that there was an express declination of jurisdiction in that case, we did

The statutory scheme appears to presuppose that there is a pending action in the child's home State, and that the respective judges in the two actions together will determine which forum is more appropriate. To facilitate such decision making, the MCCJA expressly authorizes Massachusetts judges to communicate with their out-of-State counterparts to resolve such issues. See G. L. c. 209B, § 7 (c). Other States, all of which have adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), have similar provisions.[9] See, e.g., N.Y. Dom. Rel. Law § 75-i.

---

not consider whether the home State "ha[d] stayed its proceedings or ha[d] otherwise deferred to the jurisdiction of a court of the commonwealth." G. L. c. 209B, § 2 (a) (3). We also did not address that statutory language in Orchard. See 43 Mass. App. Ct. at 780.

[9] The UCCJEA is a model code that was drafted by the National Conference of Commissioners on Uniform State Laws in 1997. See Pilkington v. Pilkington, 230 Md. App. 561, 577 (2016). It was issued in part because States had adopted different versions of an earlier model code known as the Uniform Child Custody Jurisdiction Act, which created a need "to resolve the consequent thirty years of conflicting case law." Id., quoting Friedetzky v. Hsia, 223 Md. App. 723, 734 (2015). Every State except Massachusetts has adopted the UCCJEA. See In re J.W., 53 Cal. App. 5th 347, 355 (2020). The MCCJA is loosely based on the earlier model code. See Umina v. Malbica, 27 Mass. App. Ct. 351, 354 (1989) (observing that "the MCCJA is far from a carbon copy of the Uniform Child Custody Jurisdiction Act"). While the UCCJEA and the MCCJA generally have similar provisions, they differ in some potentially important particulars. In light of the critical need for interstate coordination on child custody issues, the Legislature might want to consider adopting the UCCJEA. Cf. People ex rel S.A.G. v. B.A.G., 487 P.3d 677, 688 (Colo. 2021) (noting ability of States

Whether a judge in a pending custody matter should decline jurisdiction in favor of another State is governed by the UCCJEA in the forty-nine States that have adopted it.  As reflected in the applicable New York statute, the UCCJEA provides that a court with "jurisdiction . . . to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum."  N.Y. Dom. Rel. Law § 76-f(1).  Before deciding to decline jurisdiction in this manner, New York courts are required to consider a number of specific factors designed to ensure that the custody matter is heard in an appropriate venue.[10]  A request to decline jurisdiction can be raised in a

that have adopted UCCJEA to make certain direct requests for action by judges in other States "anywhere but Massachusetts").

[10] Pursuant to N.Y. Dom. Rel. Law § 76-f(2), the judge is required to

"consider all relevant factors, including:

"(a) whether domestic violence or mistreatment or abuse of a child or sibling has occurred and is likely to continue in the future and which state could best protect the parties and the child;

"(b) the length of time the child has resided outside this state;

"(c) the distance between the court in this state and the court in the state that would assume jurisdiction;

"(d) the relative financial circumstances of the parties;

variety of ways:  "motion of a party, the child or the child's attorney, or upon the court's own motion, or request of another court."[11]  Id.

Thus, a home State's declining jurisdiction in favor of another State is a formal act governed by substantive standards established by statute.  To be sure, the express language of the

---

"(e) any agreement of the parties as to which state should assume jurisdiction;

"(f) the nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

"(g) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and

"(h) the familiarity of the court of each state with the facts and issues in the pending litigation."

[11] Although Massachusetts was the State here asserting jurisdiction, not declining it, it bears noting that Massachusetts has a similar provision that authorizes judges with jurisdiction to decline it if there is a more appropriate forum for the custody matter to be resolved.  See Custody of Brandon, 407 Mass. 1, 11-12 (1990), citing G. L. c. 209B, § 7.  Thus, Massachusetts judges called upon to adjudicate child custody matters are to complete "a two-step analysis:  first, whether § 2 of the MCCJA confers jurisdiction upon the Massachusetts court at all; and, second, after weighing the criteria in § 7 of the MCCJA (the inconvenient forum provision), the court should exercise jurisdiction."  Umina, 27 Mass. App. Ct. at 355.  In the case before us, no party asked the judge to decline jurisdiction pursuant to § 7, and neither the judge herself nor any New York judge raised the issue.  Whether the judge would have abused her discretion by denying such a request is therefore not before us.  The issue instead is whether the judge had jurisdiction in the first place.

MCCJA allows for jurisdiction in Massachusetts not only when the judge in the other State formally has declined jurisdiction, but also where that judge "otherwise deferred" to Massachusetts.[12] G. L. c. 209B, § 2 (a) (3). While such language may provide jurisdiction in some circumstances where there has not been a formal order declining jurisdiction, the use of the verb "deferred" still connotes an active, conscious act, not mere inaction. See Webster Third New International Dictionary 591 (2002) (defining "defer" as "proffer, offer, tender . . . to submit or yield through authority, respect, force, awe, propriety"). In fact, Massachusetts case law already establishes that in circumstances where the child's home State is elsewhere, a Massachusetts judge cannot acquire jurisdiction simply by providing a home State judge notice of the Massachusetts proceeding and an opportunity to take over the matter. See Adoption of Yvette (No. 1), 71 Mass. App. Ct. at 342-343 ("the Juvenile Court could not exceed the limited scope of emergency jurisdiction simply because the courts in [the home State of the child] did not object").

---

[12] As noted, see note 8, supra, neither Adoption of Yvette (No. 1), 71 Mass. App. Ct. at 346, nor Orchard, 43 Mass. App. Ct. at 780, addressed such language. Accordingly, to the extent they suggest that jurisdiction to address permanent custody pursuant to G. L. c. 209B, § 2 (a) (3), could exist only when there has been an express declination by the home State, both cases are underinclusive.

3.  <u>Whether New York declined jurisdiction</u>.  With this background in mind, we turn to examining the various actions taken by the Schenectady judge in order to evaluate whether she thereby declined jurisdiction or otherwise deferred to Massachusetts.  As noted, at the jurisdictional conference held on December 21, 2018, the Schenectady judge expressed skepticism about whether her court was the proper forum to resolve the custody issues in light of the fact that the parents apparently had moved to New York City.  The Schenectady judge explained, however, that if the parties came before her at the hearing scheduled two weeks later on January 7, 2019, she could play two potential roles in moving the matter forward.  First, she could transfer the father's custody case against the mother to a different venue within New York, and second, she could issue a § 1034 petition to require the relevant New York DSS to initiate an investigation into Twyla's welfare.

Because it was not clear yet what action, if any, New York would take with respect to Twyla's welfare, the Schenectady judge indicated that the Massachusetts judge should not dismiss the pending care and protection action.  But she also asked the Massachusetts judge to "hold everything in abeyance" for the time being.  Even if the Schenectady judge's statement that the Massachusetts judge should consider "continuing [her] process" was intended to suggest that preliminary actions could be taken

to move the Massachusetts case forward, the Schenectady judge did not during the December 2018 hearing give the Massachusetts judge the go-ahead to resolve permanent custody issues. Simply put, all parties and the two judges appeared to agree that it made sense to wait to see what occurred at the imminent January 7, 2019 hearing before evaluating how to proceed.

As noted, the Schenectady judge dismissed the father's custody action against the mother after the father failed to serve her and did not appear at scheduled hearings. Nothing in the record suggests that at the time the Schenectady judge dismissed that case, she had come to the conclusion that Massachusetts was a more appropriate jurisdiction to try custody issues involving Twyla, or that -- purporting to act on behalf of New York -- she had decided to decline jurisdiction in favor of Massachusetts. In fact, by succinctly stating that "interstate jurisdiction was never addressed due to [the father's] failure to prosecute," the Schenectady judge made it clear in her November 27, 2023 letter that she had not taken on the jurisdictional issue when she dismissed the father's case. Thus, far from confirming that she had declined jurisdiction in favor of Massachusetts, the Schenectady judge's November 27, 2023 letter affirmatively disavowed having done so.

In addition, that letter rejected the idea of playing such a role after-the-fact: "I cannot go back in time to consider an

issue which was never ripe before this Court." Thus, at least up until the Schenectady judge's December 12, 2023 letter, it cannot fairly be said that the Schenectady judge had declined jurisdiction in favor of Massachusetts or otherwise was deferring to Massachusetts as the more appropriate forum.

That leaves the Schenectady judge's December 12, 2023 letter. To be sure, that letter adopted a markedly different approach. This time, the Schenectady judge offered that after she had dismissed the father's custody action for failure to prosecute, she "declined to exercise jurisdiction over this matter." Although this statement superficially provided the Massachusetts judge the affirmative answer she was seeking, we do not consider the Schenectady judge's statement legally sufficient to supply the missing jurisdiction. With the Schenectady judge's already having dismissed the only case that had been pending in her court, it is not at all clear how the decision whether to decline jurisdiction was even properly before her, especially where neither parent had any apparent continuing ties to Schenectady County. And even assuming that the Schenectady judge had the power to decline jurisdiction after the father's custody case had been dismissed, it does not appear possible that she could have made such a declination consistent with governing law, which, as discussed above, required the judge to consider a host of factors, all of which

pointed to New York as the appropriate jurisdiction.  See note 10, supra, listing the factors included in N.Y. Dom. Rel. Law § 76-f(2).  After all, Massachusetts plainly was not the more appropriate forum to resolve whether the mother should retain custody of Twyla.  Without a basis in applicable law, the Schenectady judge's bare statement that she "thereafter declined to exercise jurisdiction over this matter" appears to be nothing more than a courtesy offered to an out-of-State colleague who was struggling to locate jurisdiction in a case that already had been tried.[13]

To be clear, we emphasize that we are not saying that jurisdiction pursuant to the MCCJA can never be confirmed nunc pro tunc by an after-the-fact declination of jurisdiction by a child's home State.  Despite the fact that subject matter jurisdiction is often spoken of in absolute terms, at least one case has held that subject matter jurisdiction can be supplied nunc pro tunc in appropriate circumstances.  See St. Joseph's Polish Nat'l Catholic Church v. Lawn Care Assocs., Inc., 414

---

[13] We do not mean to suggest that if a judge in another State has, in the ordinary course, made an express decision to decline jurisdiction in favor of Massachusetts, a Massachusetts judge has an affirmative obligation to scrutinize that order to see if it comports with that State's laws.  In the case before us, however, there were conspicuous reasons to question this, particularly once the Schenectady judge had made it clear that she had not purported to address the jurisdictional issue at the time she dismissed the father's case.

Mass. 1003, 1004 (1993) (although Housing Court lacked subject matter jurisdiction over dispute, problem was cured by postjudgment order from Chief Administrative Justice of Trial Court designating Housing Court judge as Superior Court judge).[14] It may well be that there are circumstances where an after-the-fact declination of jurisdiction by the home State is appropriate to confirm MCCJA jurisdiction nunc pro tunc.  This is not one of them.

We further recognize that when judges are called upon to address emergency custody matters that come before them, yet permanent custody issues remain, it may at times be difficult to resolve whether a court in the child's home State is declining jurisdiction.  This problem is especially acute when there no custody action pending in that State (or country).  See People ex rel. S.A.G. v. B.A.G., 487 P.3d 677, 687 (Colo. 2021) (S.A.G.) (discussing problem).  Given the importance of not leaving a child in limbo, it may become a practical necessity for courts to resolve permanent custody issues even in the absence of an overt declination by the home State.  An illustrative example of such a situation is In re M.M., 240 Cal.

---

[14] Contrast Davis v. New York, 22 A.D.2d 733, 733 (1964) ("Where, as here, the subject matter is jurisdictional, the error cannot be corrected by an order nunc pro tunc").  Given how we rule here, we need not decide whether Massachusetts or New York law governs the nunc pro tunc issue.

App. 4th 703 (2015).  In that case, the child's home "State"

under the UCCJEA was Japan, even though there was "ample

evidence in the record to support the finding that California

and not Japan [was] the more appropriate forum to exercise

permanent jurisdiction in this child custody proceeding."[15]  Id.

at 717 n.6.  Whether California had jurisdiction under the

UCCJEA turned on whether Japan had declined jurisdiction.  Id.

at 717.  The judge made detailed, extensive efforts to

communicate with the relevant court in Japan, all to no avail.

Id. at 710-714.  In fact, Japanese judicial officials made it

plain that it would be inappropriate even to communicate about

such issues.  Id.[16]  Deeming such efforts exhausted, the

California judge concluded that the home State effectively had

---

[15] A California child welfare agency took custody of a child
of an American serviceman stationed in San Diego after the
father committed an act of domestic violence against the mother
in California in the child's presence.  See In re M.M., 240 Cal.
App. 4th at 707, 711.  Both parents and the child all lived in
California, and they intended to remain there upon
reunification.  Id. at 711.

[16] The California judge made extensive multiple attempts,
orally and in writing, to discuss jurisdiction with the local
Japanese family court (apparently in the locality where the
family had resided).  In re M.M., 240 Cal. App. 4th at 709-710.
The local Japanese court eventually contacted the Supreme Court
of Japan, but the net result was that "edicts came down, strong
and firm and decisive, that that's not appropriate and that 'we
can't talk to you through email; we can't talk to you on the
phone and we're not going to do that.'"  Id. at 710.  Undaunted,
the California judge made multiple further efforts, but "was met
with polite but solid resistance."  Id.

declined jurisdiction and proceeded to entertain the permanent custody issues before him. Id. The intermediate appellate court affirmed, despite the fact that there was no overt declination from a court in Japan. Id. at 717. Along the way, the court held that:

> "a home state declines jurisdiction in any manner that conveys its intent not to exercise jurisdiction over a child in connection with a child custody proceeding, including inaction or, as in the instant case, by refusing to even discuss the issue of jurisdiction despite myriad good faith attempts to do so by the juvenile court, that such inaction or refusal is tantamount to a declination of jurisdiction by the home state on the grounds California is the more appropriate forum under [the relevant subdivision of the applicable jurisdictional provision]."

Id. See S.A.G., supra at 687-688 (adopting same standard); Interest of T.B., 497 S.W.3d 640, 652 (Tex. Ct. App. 2016) (failure by Florida court to respond to multiple requests to decline jurisdiction "constitute[d] an implied determination by the Florida court to decline to exercise its home-state jurisdiction and an implied determination by the Florida court that Texas is a more convenient forum").[17]

In this manner, some courts have held that in appropriate circumstances, jurisdiction over a child custody matter can constructively be declined by a home State. We need not decide

---

[17] Interest of T.B. was a private custody dispute between the parents. There was a pending custody case in Florida, the child's home state, so there was an identified court that could decline jurisdiction. See Interest of T.B., 497 S.W.3d at 643.

whether to follow such precedent here, because doing so would do little to assist the department's position. This is not a case, like In re M.M., where the State asserting jurisdiction was in any event the more appropriate forum, and the judge asserting jurisdiction had made exhaustive efforts to get the home State to decline jurisdiction. Granted, the department and the judge faced daunting challenges in trying to navigate the New York child welfare system, especially with respect to parents who led such transient lives. However, the current record does not establish that such problems were insurmountable.

For example, we see no reason why -- at least once the parents had moved back to Amsterdam in 2019 -- the department could not have requested the Montgomery County DSS to initiate an investigation into Twyla's welfare in order to decide whether to file a "child protective proceeding" (the New York counterpart to what is known as a care and protection proceeding in Massachusetts). See N.Y. Fam. Ct. Act, Art. 10. Indeed, that very entity in fact became involved in examining Twyla's welfare, albeit in the specific context of processing the department's ICPC request. If the DSS had decided to file a child protective proceeding, this would have provided a case to which the Massachusetts judge could have deferred (as she long had recognized was the appropriate result). Of course, it is possible that the DSS might have decided that a child protective

proceeding was not warranted, but that the agency instead should provide the family supports in an effort to keep it intact.  In that event, the judge could have ordered the department to work with the DSS to ensure Twyla's safe return.[18]  See Adoption of Yvette, 71 Mass. App. Ct. at 341 (recognizing that Massachusetts judge could have ordered department to work with Maryland counterpart to return child safely there).[19]

Although our decision on jurisdiction obviates the need for us to reach the mother's argument regarding the merits, we acknowledge that there is at least some force to the mother's contention that the jurisdictional problem directly affected her ability to defend this action.  For example, it may well be true that having Twyla placed in custody far from the mother's home hampered the mother's ability to maintain a relationship with her.  It also stands to reason that the local DSS would have been in a superior position to assess what public resources might be brought to bear to support reunification of the family in Amsterdam, a location that the assigned department social

_____

[18] We recognize the theoretical possibility that concerted efforts to get New York officials to engage still could fail. In that event, the department could seek to make its case that Massachusetts has exhausted its efforts to get New York to take over the matter, and that home State jurisdiction constructively has been declined.  That did not occur here.

[19] We note that a formal ICPC agreement was not statutorily required to return Twyla to her parents.  See Adoption of Knox, 102 Mass. App. Ct. at 89-92.

worker never visited in person during the years that the mother lived there.

We do not mean to suggest that the precise path the judge should have taken here was obvious. To the contrary, even putting aside the crush of Juvenile Court caseloads, we are sympathetic to the immense practical challenges that the judge faced in trying to resolve the jurisdictional issues presented here, all while trying to protect Twyla from abuse and neglect. At the heart of those challenges is the conundrum created by a statutory scheme in which subject matter jurisdiction turns on whether a court in the home State has accepted or declined jurisdiction, even where there is no existing appropriate case in the home State for such a decision to be made. Although the pathway to solving that problem may not be obvious, some lessons can be drawn. Where a patent jurisdictional defect is presented in a care and protection action and another State plainly presents a more appropriate forum, it is incumbent on the judge to press whatever levers are available to force the issue to resolution. These prominently include issuing orders to the department to work with its counterparts in the appropriate jurisdiction to advance the proceedings there. Going forward to resolve permanent custody issues in Massachusetts should occur only where reasonable efforts to defer to the more appropriate jurisdiction have been exhausted.

The question remains what remedy is appropriate here.[20] Because the judge lacked subject matter jurisdiction to resolve the permanent custody issues, the decree must be vacated. In addition, as the mother points out in her supplemental brief, the order dated January 22, 2020, granting the department permanent custody must also be vacated. This does not negate the judge's emergency jurisdiction to address temporary custody issues while the jurisdictional issues are resolved on remand. See Adoption of Anisha, 89 Mass. App. Ct. at 827 (during period between assertion of emergency jurisdiction and home State's eventual declination of jurisdiction, no error in Massachusetts judge's keeping care and custody case open while jurisdictional issues were resolved). More importantly, it does not erase the care and protection concerns that underlay the judge's decree. Finally, as the mother herself laudably recognizes, even were her current fitness unquestioned, a transitional process would

---

[20] The mother has requested that we implement a number of institutional measures designed to ensure that the problems that occurred here do not happen in other cases, either by requiring them directly, or ordering the Juvenile Court to do so. For example, she has requested that, going forward, we require that the department to specify the basis of the Juvenile Court's "jurisdiction in all pleadings including temporary custody hearing, hearing on the merits, and termination of parental rights." The mother has even proposed a court form that could be used for this purpose in the Juvenile Court. Whatever the merits of the mother's proposed prophylactic measures, we decline to adopt them as we are neither the administrators of the Juvenile Court nor an appellate court with general superintendence powers.

need to be established for Twyla to be placed back with her. The fact that Twyla enjoys love from both her mother and her long-term foster mother provides hope for Twyla's future however the permanent custody issues are resolved.

We vacate the decree terminating the mother's parental rights, as well as the order dated January 22, 2020, granting permanent custody of Twyla to the department.  We remand this action for the judge to formulate an order directing the department to work with the applicable New York State, county, or municipal agencies to initiate an investigation into Twyla's welfare, and for other proceedings consistent with this opinion.[21]

> So ordered.

---

[21] In her supplemental brief, the mother has suggested that the judge, or perhaps the Chief Justice of the Trial Court, somehow directly could transfer this matter to the appropriate court in New York State.  We are unaware of a means to accomplish that.  To the extent that the mother points to provisions in the UCCJEA that provide judges some reciprocal rights to effect action in another State's custody litigation, those provisions do not appear to provide the sort of remedy the mother is seeking, even if they applied to a State that had not adopted the UCCJEA.  In addition, we have no reason to question the Schenectady judge's assessment that, under New York law, a child protective case needs to begin with an agency investigation by the appropriate DSS.  However, to be clear, we note that by focusing on the option of ordering the department to work with its counterparts in New York State to lay the groundwork for the judge to defer jurisdiction to a New York court, we do not mean to prohibit the judge from pursuing other options should they emerge during the remand proceedings.